**DENVER AREA MEAT CUTTERS AND EMPLOYERS PENSION PLAN, derivatively on behalf of Clayton Homes, Inc.**

v.

**James L. CLAYTON, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Aug. 27, 2003 Session.

Sept. 3, 2003.

Application for Permission to Appeal Denied by Supreme Court Sept. 24, 2003.

Permission to Appeal Denied by Supreme Court Sept. 29, 2003.

John A. Lucas and John G. Brock, Knoxville, Tennessee; Edward J. Fuhr, Stacy M. Colvin, Eric H. Feiler, and Terence J. Rasmussen, Richmond, Virginia; Gregory P. Williams, Wilmington, Delaware; and Jerry G. Cunningham, Maryville, Tennessee, for the appellants, James L. Clayton, Kevin T. Clayton, C. Warren Neel, B. Joe Clayton, Steven G. Davis, Dan W. Evins, Wilma H. Jordan, Thomas N. McAdams, and Clayton Homes, Inc.

George E. Barrett, Douglas S. Johnston, Jr., Timothy L. Miles, James G. Stranch, III, and C. Dewey Branstetter, Nashville, Tennessee; Darren J. Robbins, Randall J. Baron, A. Rick Atwood, Jr., and Mary K. Blasy, San Diego, California; and David R. Duggan, Maryville, Tennessee, for the appellees, Denver Area Meat Cutters and Employers Pension Plan.

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

## OPINION

The focus of this litigation is on the merger of (1) Clayton Homes, Inc., a Delaware corporation, which, pre-merger, was a publicly-owned corporation whose stock was traded on the New York Stock Exchange, with (2) B Merger Sub Inc., also a Delaware corporation. Before the merger, B Merger Sub Inc. was a wholly-owned subsidiary of Berkshire Hathaway, Inc. The latter company is a publicly-owned Delaware corporation; its stock is traded on the New York Stock Exchange. We granted an extraordinary appeal to the defendant Clayton Homes, Inc., and the individual defendants, all of whom were members of that corporation's pre-merger board of directors, in order to review the trial court's order of August 18, 2003, attached as Appendix A to this opinion. The defendants' application for review—filed pursuant to the provisions of Tenn. R.App. P. 10—asks us to determine "(1) whether the [trial court] properly granted Plaintiff's request for a [temporary restraining order]; (2) whether the [trial court] properly found that Plaintiff retained standing to maintain its derivative claims [;] and[ ](3) whether the [trial court] properly lifted the stay previously issued in this action." We hold (1) that the trial court's "status quo" order—essentially a temporary injunction—was erroneously issued and, accordingly, we vacate that order; (2) that the plaintiff lacks standing to pursue its stockholders' derivative claims, and, consequently, we vacate the trial court's order denying the defendants' motion to stay as to those claims; (3) that the trial court should dismiss the plaintiff's stockholders' derivative claims upon the filing of an appropriate motion to dismiss; and (4)

that the trial court did not err in permitting, at this time, the plaintiff's putative class action lawsuit for damages to proceed forward in the court below. The trial court's order is vacated in part and affirmed in part and this case is remanded to the trial court with instructions. We direct that the order issued pursuant to this opinion will be stayed until 4:30 p.m. EDT, September 8, 2003, in order to afford each of the parties an opportunity to request further appellate review by the Supreme Court.

## I. *Background*

### A. The Merger

On April 1, 2003, Clayton Homes, Inc. ("Old Clayton Homes"), B Merger Sub Inc., and Berkshire Hathaway, Inc. ("Berkshire") entered into an agreement entitled "Agreement and Plan of Merger" ("the merger agreement"), by the terms of which B Merger Sub Inc. would be merged into Old Clayton Homes with the latter being "the successor or surviving corporation in the Merger ... under the name of 'Clayton Homes, Inc.'" ("New Clayton Homes"). According to the terms of the merger agreement, "upon completion of the merger, [each stockholder in Old Clayton Homes would] be entitled to receive $12.50 in cash for each share of [Old] Clayton Homes common stock that [the stockholder] own[ed]," and New Clayton Homes would be a wholly-owned subsidiary of Berkshire. The merger agreement was publicly announced on April 1, 2003. The merger contemplated a total payment of approximately $1.7 billion to the stockholders of Old Clayton Homes of record at the close of business on June 2, 2003. 136,210,180 shares of common stock were then outstanding.

On or about June 16, 2003, Old Clayton Homes sent a letter to its stockholders formally advising them of the proposed merger. The letter transmitted (1) a proxy statement with a copy of the merger agreement and (2) a notice of a special stockholders' meeting to be held in Knoxville on July 16, 2003, at 11:00 a.m. EDT to vote on the proposed merger "as the merger agreement may be amended from time to time." The letter to the stockholders advised them that the board of directors of Old Clayton Homes, "by a unanimous vote," had "(1) determined that the merger is advisable and that the terms of the merger are fair to, and in the best interests of, Clayton Homes and our stockholders, (2) approved the merger agreement and the transactions contemplated thereby, including the merger, and (3) recommended that our stockholders approve and adopt the merger agreement and the transactions contemplated thereby, including the merger."

As would later become significant, the proxy statement recited that

> [t]he persons you name as proxies may propose and vote for one or more adjournments or postponements of the special meeting, including adjournments or postponements to permit further solicitations of proxies. No proxy voted against the proposal to adopt the merger agreement will be voted in favor of any adjournment or postponement.

### B. The Meeting

The special meeting of the stockholders was convened on July 16, 2003. Following discussion, including a question and answer period, the meeting was adjourned to July 30, 2003. No formal vote on the proposed merger was taken at the July 16, 2003, meeting.

Proxies under the control of Kevin T. Clayton, the Chief Executive Officer of Old Clayton Homes, and James L. Clayton, Chairman of the Board of Directors of Old Clayton Homes, were voted at the July 16, 2003, meeting in favor of the adjournment

motion. The announced purpose of the adjournment was to afford Cerberus Capital Management L.P. ("Cerberus")—a potential competing suitor for ownership of Old Clayton Homes—an opportunity to determine whether it wanted to submit a bid to buy the company. In order to secure Berkshire's agreement to the postponement, Old Clayton Homes agreed to pay Berkshire $5 million.

Following a due diligence study of Old Clayton Homes, Cerberus, by letter to Kevin T. Clayton dated July 28, 2003, advised Old Clayton Homes that Cerberus "ha[d] determined to terminate discussions regarding a possible transaction and not make any offer for Clayton Homes."

On July 30, 2003, the adjourned meeting of the stockholders of Old Clayton Homes was held as specified in the July 16, 2003, adjournment motion. The holders of 115,-712,882 shares of the common stock of Old Clayton Homes were represented in person or by proxy at the adjourned meeting. A motion was duly made to approve the proposed merger pursuant to the merger agreement. It passed with the following later-certified vote:

| | |
|---|---|
| For | 71,309,699 |
| Against | 44,035,083 |
| Abstain | 368,100 |

The numbers represent a vote in favor of the proposed merger by a margin of approximately 52.35% to 47.65%.[1] Since 50% of the total shares of common stock plus one share amounts to 68,105,091 shares, the margin of the vote for the proposed merger was 3,204,608 shares.

## C. The Delaware Litigation

Prior to the stockholders' meeting of July 16, 2003, a stockholder of Old Clayton Homes—Mark Blosser—filed suit in the Court of Chancery of the State of Delaware (New Castle County) challenging the legality and propriety of the proposed merger. His complaint was filed on May 16, 2003. For convenience, this litigation will be referred to in this opinion as "the Blosser Delaware litigation." Blosser sought an order of the Delaware court that his "action may be maintained as a Class Action and certifying [him] as the Class Representative." The Blosser Delaware litigation named the same defendants as those sued in the case at bar. The Blosser Delaware complaint claimed (1) that the individual defendants[2] were guilty of breach of their fiduciary duty "under *Revlon*"[3] (emphasis added); (2) that they were guilty of other breaches of their fiduciary duty; and (3) that they violated *8 Del. C. § 141*[4] by agreeing to the merger agreement in which they allegedly "surrendered any ability to fulfill [their] statutory duties to Clayton Homes, and its stockholders" and by taking a "series of deliberate actions which effectively disable the Director Defendants from managing the business and affairs of Clayton Homes." In addition to other relief, the complaint in the Blosser Delaware litigation seeks an injunction against the defendants from proceeding with or completing the proposed merger. Alternatively, in the event the merger is consummated, the plaintiff in that case seeks damages.

---

1. The percentage of affirmative votes is based upon a comparison of the total affirmative votes—71,309,699—to the total shares outstanding—136,210,180. An affirmative vote of a majority of all outstanding shares of common stock was required to adopt the merger agreement.

2. As previously intimated, Old Clayton Homes was also named as a defendant.

3. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

4. In general, *8 Del. C. § 141* deals with boards of directors of Delaware corporations, their composition, and powers.

On July 10, 2003, Orbis Investment Management, Ltd. ("Orbis"), also a stockholder of Old Clayton Homes, filed suit[5] in the same Delaware Chancery Court. Its complaint is entitled "Complaint Pursuant to 8 Del. C. § 220 to Compel Inspection of Books and Records" ("the Orbis Delaware litigation"). Orbis sought information and documentation pertaining to the stockholders of Old Clayton Homes in order to communicate with them and urge them to join Orbis in opposing the proposed merger. Orbis sought a court order requiring Old Clayton Homes "to permit the requested inspection and copying immediately." The Delaware Chancery Court ordered Old Clayton Homes to produce the data regarding the company's stockholders to Orbis. The material was subsequently handed over to Orbis.

When the stockholders' meeting of July 16, 2003, was adjourned, Orbis, on July 17, 2003, pursued relief in Delaware, challenging the adjournment and seeking a court order to require Old Clayton Homes to immediately reconvene the adjourned special meeting. The Delaware court ordered an expedited hearing on Orbis' adjournment claims; however, before the scheduled date of the hearing, Orbis withdrew its application for a temporary restraining order.

On July 23, 2003, Old Clayton Homes agreed to Orbis' request that Orbis's proxy advisor, Alan M. Miller, be permitted to review the proxies, the ballots, and the preliminary tabulation of the vote on the proposed merger.

As the recited facts suggest, a number of hearings have been held in both Delaware cases. Some of those hearings occurred before the July 30, 2003, vote and some took place after the vote. As of the filing of this opinion, apparently both of these Delaware cases are still pending.

### D. The Instant Case

On July 25, 2003, the plaintiff, Denver Area Meat Cutters and Employers Pension Plan, filed the instant action alleging a stockholders'[6] derivative claim on behalf of Old Clayton Homes in addition to a class action claim. In general terms, the suit alleges that the individual directors breached their fiduciary duty; that the merger terms are "draconian" and unfair; that, in approving the merger, the individual director defendants had conflicts of interest and that they opted to act in their own self-interest; and that the defendants "manipulated the corporate machinery" when they adjourned the July 16, 2003, meeting. The plaintiff's complaint seeks class certification, damages for breach of fiduciary duty, and an injunction against the consummation of the proposed merger. The operative allegations of the plaintiff's suit are strikingly similar to allegations in the Blosser Delaware litigation and the Orbis Delaware litigation.

The plaintiff sought a temporary restraining order ("TRO") from the trial court to prevent the defendants from further postponing a vote on the proposed merger. On July 29, 2003, the trial court

---

5. Sometime after April 22, 2003, Orbis had filed another suit against Old Clayton Homes and its directors in the same Delaware court. That litigation is not directly pertinent to the issues in the case at bar. Furthermore, there is a suggestion in the record that other cases were filed in Delaware but apparently, if filed, they are no longer significant. We say this in view of the fact that neither party has made a reference to any other suits in the briefs.

6. The plaintiff claims that it is the beneficial owner of 45,000 shares of the common stock of Old Clayton Homes. The company states that it has no record of the plaintiff's claimed stock ownership. When this matter proceeds to trial, it will be incumbent upon the plaintiff to prove standing to pursue its class action claims. For the time being, the plaintiff's stock ownership is assumed.

held a hearing on the plaintiff's application. In the course of arguing for a TRO to make sure that Old Clayton Homes took the vote on July 30, 2003, counsel for the plaintiff made an extensive presentation, excerpts of which follow:

The company already knows how the vote has come out. The reason that they sought the initial delay is because they knew that the merger had been voted down. They sought the delay to try to change those votes and to reverse what they knew was inevitable. We believe that the vote is still against the merger, and we believe that the—that any reason that the company would have is to do nothing other than to change what they already know is the outcome.

\* \* \*

What we have is an offer on the table, a vote that is to take place, and what we[,] representing the shareholders[,] are seeking to do is to insure that that vote go[es] forward. And the only way to insure that that vote goes forward is for the Court to enter an order restraining the board from taking further action to again postpone or delay the counting of these votes.

\* \* \*

... all we are really seeking from this Court today is an order that requires this company to—the Board of Directors to do what they have already said they are going to do. The further delay in this harms the company because of the uncertainty that continues.

The longer this goes on, and the more opportunities there are for the board to step in and cause delay, the more there becomes the perception—and I emphasize that word "perception"—that the vote is somehow being manipulated to achieve an end that is favorable to the board.

So the entry of this order would be good for the company and, frankly, whether they want to admit it or not, would be good for the board to eliminate that perception of machinations.

These excerpts are consistent with and in the context of the thrust of counsel's argument on behalf of the plaintiff.

The trial court granted the plaintiff's application, telling counsel for the plaintiff to draft an order "direct[ing] that the Board of Directors are enjoined [i.e., required] to hold their stockholders' meeting on July the 30th, 2003, and to hold a shareholders' vote relative to the proposed [merger]." The trial court noted that should the directors determine that the taking of a vote on July 30, 2003, would cause them to violate their fiduciary duty, they could apply to the trial court for immediate relief from the order.

With respect to the postponement of the vote from July 16, 2003, to July 30, 2003, the trial court observed that "based on this hearing today, [the Board of Directors] have committed no wrong."[7]

Following the stockholders' vote on July 30, 2003, an August 6, 2003, hearing was held in the trial court on the plaintiff's motion for a TRO to prevent the consummation of the merger. At the same time, the trial court also considered the defendants' motion to stay the plaintiff's suit

7. In a July 17, 2003, hearing, the Vice Chancellor in the Orbis Delaware litigation also expressed doubt as to whether the adjournment decision had violated any stockholder rights under Delaware law:

Look, I'm struggling with the legal idea here of what the right is that's been infringed. There was a meeting scheduled. No vote was taken. The meeting was adjourned. Now, both the statute and, presumably, this company's bylaws contemplate adjournment of meetings.

based upon the pending Delaware suits. On the day of the hearing, the trial court denied the plaintiff's application for a TRO; instead it entered an order staying both the stockholders' derivative claims and the putative class action claims for damages.[8] In a subsequent telephone conference call with counsel later the same day, the trial court again refused to grant the plaintiff's request for a TRO.

On August 7, 2003, at 9:29 a.m. EDT, the plaintiff filed an application for an extraordinary appeal in the Court of Appeals. The filing was made pursuant to Tenn. R.App. P. 10. The plaintiff asked us to grant the TRO that the trial court had denied.

Unbeknownst to the plaintiff when it filed its Tenn. R.App. P. 10 application in this court, a "Certificate of Merger of B Merger Sub Inc. with and into Clayton Homes, Inc." had been filed with the Delaware Secretary of State at 7:29 a.m. EDT on the same day. *See* Appendix B. The Secretary of State certified the filing of the Certificate of Merger in a separate document. *See* Appendix C. When, in the morning of August 7, 2003, prior to the opening of the market, the New York Stock Exchange was notified of the filing of the Certificate of Merger, it halted further trading in the common stock of Old Clayton Homes.

This court held two hearings on August 7, 2003, one in the morning and one in the afternoon. The plaintiff argued that, despite the earlier filing of the Certificate of Merger, the merger had not occurred because of the following language from *8 Del. C. § 103*, particularly the emphasized portion of the statute:

Upon delivery of the instrument, and upon tender of the required taxes and fees, the Secretary of State shall certify that the instrument has been filed in the Secretary of State's office by endorsing upon the original signed instrument the word "Filed," and the date and hour of its filing. This endorsement is the "filing date" of the instrument, and is conclusive of the date and time of its filing *in the absence of actual fraud.*

(Emphasis added). It argued that the complaint alleged fraud.

We granted the plaintiff's Tenn. R.App. P. 10 application. Because the status of the merger was unclear to us and because we felt that a record should be developed below as to the meaning and application of the "absence of actual fraud" language of *8 Del. C. § 103*, we remanded this matter to the trial court under an order that provides, in pertinent part, as follows:

This case is remanded to the Trial Court for a determination of whether Plaintiff still has standing to maintain its derivative action in light of the current status of the Merger, or whether the Merger in its current status has eliminated Plaintiff's standing to pursue its derivative action.

If the Trial Court concludes that Plaintiff no longer has standing to pursue its derivative action then, upon proper motion by Defendants, Plaintiff's derivative action shall be dismissed by the Trial Court due to Plaintiff's lack of standing, with the Trial Court's ruling on the standing issue being subject to appellate review at the appropriate time.

---

8. Following this hearing, and as required by the trial court, the defendants gave counsel for the plaintiff 12 hours advance notice that the merger would occur the next day, August 7, 2003. The letter, addressed to plaintiff's counsel, recites, in its entirety, as follows:

This letter constitutes notice as ordered by Judge W. Dale Young that Clayton Homes, Inc. intends to close the merger that is the subject of this action at some time after twelve hours from now (4:30 p.m. EDT, August 6, 2003).

If the Trial Court concludes that Plaintiff still has standing to proceed with its derivative action, then the Trial Court is ordered to reconsider Defendants' Motion to Stay and Plaintiff's Motion for a Temporary Restraining Order. In its order resolving these motions after reconsideration, the Trial Court is instructed to state with specificity the reasons for its rulings on these motions as relating to the derivative action.

Even if the Trial Court concludes that Plaintiff lacks standing to pursue its derivative action, the Trial Court is directed to reconsider Defendants' Motion to Stay and Plaintiff's Motion for a Temporary Restraining Order as applicable to Plaintiff's class action claim contained within Plaintiff's first Amended Complaint. In its order resolving these motions after reconsideration, the Trial Court is instructed to state with specificity the reasons for its rulings on these motions as relating to the class action claim.

(Numbering in original omitted). In the same order, we directed the defendants to take no further action related to the merger between Clayton Homes Inc., and Berkshire Hathaway Inc., . . . until a determination is made by the Trial Court pursuant to this Court's instructions on remand. The purpose of this Order is to maintain the status quo of the current state of the Merger, whatever that status may be, pending resolution by the Trial Court of the remanded issues.

Following a hearing on remand, the trial court held that the plaintiff had made a *prima facie* showing of fraud such that its stockholders' derivative *cause of action and* class action lawsuit should proceed on an expedited basis; that the defendants' motion to stay those suits was denied; that the "Defendants are hereby restrained from any action to change the status quo of the subject merger until further orders of this Court or upon further orders of a superior Court"; and that pending reversal on appeal, such causes of action as survive would be tried by the trial court within 30 to 45 days from August 16, 2003.

We granted the defendants' application for an extraordinary appeal. As directed in our order granting the application, the plaintiff filed a response to the application and the defendants filed a reply brief. Oral arguments were heard by the Court on August 27, 2003, and the matter is now before us for decision.

## II. *The Issues*

The issues before us can be narrowed down to three basic questions:

1. Has the merger of Old Clayton Homes and the subsidiary of Berkshire occurred; and, if so, does the merger deprive the plaintiff of standing to pursue a stockholders' derivative action on behalf of Old Clayton Homes?

2. Is the plaintiff entitled to a temporary injunction to prevent, in the words of the trial court, "any action to change the status quo of the subject merger"?

3. Should the plaintiff's class action claims be stayed in deference to the pending class action claims asserted in the Blosser Delaware litigation?

## III. *Stockholders' Derivative Action*

■ The parties agree that the merger of these two Delaware corporations is controlled by the substantive law of Delaware. It is to Delaware law that we now turn.

*8 Del. C. § 251* clearly states when a merger is "effective":

If a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for the adoption of the [merger] agreement, that fact shall be certified on the agreement by the secre-

tary or assistant secretary of the corporation. If the agreement shall be so adopted and certified by each constituent corporation, it shall then be filed and *shall become effective* in accordance with § 103 of this title.

(Emphasis added). The date and time of the filing is established pursuant to *8 Del. C. § 103*, a provision dealing with the filing of an "instrument" in the office of the Delaware Secretary of State. According to *8 Del. C. § 103*, the date and time placed on the instrument by the Secretary of State is "conclusive" as to the date and time of the instrument's filing "in the absence of fraud."

We would make a number of observations about the language "in the absence of fraud." First, we note that § 103 refers to an "instrument" and not just to a certificate of merger. It is also clear to us that the "actual fraud" contemplated by § 103 is fraud involved in the endorsement of the Secretary of State on the instrument. There is nothing in the language to suggest that the "actual fraud" of § 103 means fraud in the transaction described in or represented by the instrument.

In the instant case, the Secretary of State noted on the Certificate of Merger that it was "filed," as that word is referred to in § 103, at 7:29 a.m., August 7, 2003. There is no allegation or suggestion or a scintilla of evidence that there was fraud, actual or otherwise, in the placing of the Secretary of State's stamp on the Certificate of Merger. Therefore, the stamp is conclusive as to the date and time of filing and, pursuant to § 251, the merger was effective at 7:29 a.m. August 7, 2003.

It should also be noted that Old Clayton Homes proceeded with the merger at a time when there was no outstanding court order prohibiting it from moving forward to complete the merger. Furthermore, it violated no law that we are aware of in proceeding as it did.

According to the merger agreement, New Clayton Homes was the surviving corporation. Since the merger was effective at 7:29 a.m., August 7, 2003, it was at that time that Berkshire became the sole stockholder of New Clayton Homes. It was also at that time that the plaintiff ceased to have standing to pursue a stockholders' derivative action. This is because the cause of action belonging to Old Clayton Homes passed to New Clayton Homes when the merger was effective. If such a cause of action existed pre-merger, it passed to Berkshire as the sole stockholder of the surviving corporation.

The issue now before us was addressed in the case of *Lewis v. Anderson*, 477 A.2d 1040 (Del.1982). In *Lewis*, the Supreme Court of Delaware alluded to earlier Delaware cases in support of the following:

> In the context of a corporate merger, the following authorities hold that a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at time of commencement of suit but that he must also maintain shareholder status throughout the litigation.

*Id.* at 1046 (citations omitted). Lest there be any doubt about its holding, the *Lewis* Court stated that "[a] merger which eliminates ownership of stock eliminates standing to pursue a derivative claim." *Id.* at 1047. *See also Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 354 (Del.1988) ("To have standing to maintain a shareholder derivative suit, a plaintiff must be a shareholder at the time of the filing of the suit and must remain a shareholder throughout the litigation.").

In summary, we hold that the merger of Old Clayton Homes and the subsidiary of Berkshire occurred at 7:29 a.m., August 7, 2003, and as a result of that merger, the plaintiff in the case at bar lacks standing

to further pursue the stockholders' derivative suit filed by it in this case.

## IV. *Status Quo Injunction*

### A. Fraud Exception to *Lewis* Rule

■ While tacitly acknowledging the effect of *Lewis* and its progeny on its standing to pursue a stockholders' derivative suit in this case, the plaintiff urges us to allow it to prove that the individual defendants were guilty of actionable fraud that invalidates the merger. Apparently, the ultimate goal of the plaintiff is to invalidate the merger and thereby re-acquire standing. The plaintiff argues that it has made a sufficient preliminary showing of actionable fraud to warrant the continuation of the status quo injunction issued by the trial court.

■ The *Lewis* case recognizes two exceptions to the rule that a merger extinguishes a former stockholder's standing to pursue a derivative action on behalf of a merged corporation:

> The two recognized exceptions to the rule are: (1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise.

*Lewis*, 477 A.2d at 1046, n. 10 (citations omitted). Since we are not dealing with a reorganization, we do not need to deal with the second exception. While the first exception—"where the merger itself is the subject of a claim of fraud"—might appear, at first blush, to apply to the facts of this case, it is clear from the *Lewis* case that this exception only applies to those situations where a merger is undertaken for the purpose of eliminating a stockholders' derivative claim. This meaning is clear from the language immediately following the language quoted above:

> Those exceptions are not applicable to this case. *Plaintiff has not asserted that the merger was perpetrated to de-prive Old Conoco of its claim against the individual defendants.*

*Id.* (emphasis added) (citations omitted). *See also Kramer*, 546 A.2d at 354–55 ("Kramer does not contend that the merger was fraudulent, perpetrated merely to deprive Western Pacific of its claim against the defendants."). While the plaintiff has ascribed a number of nefarious motives to the individual defendants' approval of the merger, the elimination of a stockholders' derivative claim is not one of them.

It is clear that neither of the exceptions to the effect of a merger on standing—and, most importantly, the one pertaining to "where the merger itself is the subject of a claim of fraud"—applies to the facts of this case.

### B. Generalized Fraud

When we first remanded this case to the trial court, we wanted that court to focus on the "current status of the Merger, or whether the Merger in its current status ha[d] eliminated [the] Plaintiff's standing to pursue its derivative action." At the hearings in this court prior to the remand, we, as well as counsel for the parties, were struggling with the meaning and effect of 8 *Del. C.* § *103* and particularly its "in the absence of fraud" language. That code provision was first raised the morning of our hearing and neither party had had a real opportunity to research the issue and brief it for the court. Furthermore, neither we nor counsel for the plaintiff had a well-developed factual record pertaining to the subject. These factors weighed heavily in our decision to remand for a hearing in the trial court.

Apparently, following the remand, the parties came to realize—as we now realize—that the "actual fraud" language of 8 *Del. C.* § *103* is simply not implicated by the facts of this case. At the hearing on

remand, the plaintiff focused the trial court's attention on its theory that its claim of breach of fiduciary duty/fraud could vitiate the merger *regardless of its status at that time.* The trial court, through no fault of its own, addressed the issue presented to it by the plaintiff. We will now examine the plaintiff's position on its generalized claim of breach of fiduciary duty/fraud as it relates to the merger.

The plaintiff claims that the defendants were guilty of fraud in approving the merger and in recommending the merger's approval to the stockholders; in adjourning the special stockholders' meeting of July 16, 2003; and in holding the meeting of July 30, 2003, and conducting the vote of the stockholders at that meeting. They contend that their allegations of misconduct, as developed through discovery permitted by the trial court on remand, make a preliminary showing of fraud sufficient to preserve the "status quo" order in place and to ultimately undo the merger, which, as we have previously stated, was effective August 7, 2003. In our judgment, the plaintiff is wrong, both legally and factually.

To support its position that its generalized fraud charges, as fleshed out in discovery, are legally sufficient to invalidate the merger, the plaintiff calls our attention to four Delaware cases. We will examine these in turn.

■■■■ The plaintiff quotes the following from *Solomon v. Armstrong,* 747 A.2d 1098 (Del.Ch.1999), *aff'd,* 746 A.2d 277 (Del.2000):

Void acts are those acts that the board, or more generally the corporation, has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy. As defined by decisional law, void acts are those acts that are not performed in the interest of the corporation, irrespective of whether or not they are authorized by a corporation's certificate of incorporation. The list of void acts, while not exclusive, is nonetheless very-restricted. Void acts include fraud, gift, waste, or *ultra vires* acts. No amount of shareholder ratification validates acts repugnant to public policy (*e.g.,* fraud), and which are therefore void *ab initio.*

*Id.* at 1114. The plaintiff uses this quote to buttress its argument that the "fraud" upon which it relies renders the merger void *ab initio.* This quote, while an accurate statement of general law, is of no particular help in this case. *Solomon* does not deal with a merger and, hence, there is no suggestion in that case as to how an allegation of fraud or even proof of fraud would impact a merger that has already occurred. However, the plaintiff does rely on three cases involving Delaware law that do deal with mergers and how breach of fiduciary duty/fraud impacts mergers that have occurred.

In *Ramsburg v. American Investment Co. of Illinois,* 231 F.2d 333 (7th Cir.1956), stockholders of Domestic Finance Corporation ("Domestic") sought in district court to restrain the merger of Domestic with the defendant, American Investment Co. of Illinois ("American"). *Id.* at 335. Both Domestic and American were Delaware corporations. *Id.* In their complaint, the Domestic shareholders alleged that American, "through divers means," *id.,* had acquired control of Domestic and, by virtue of that control, "had so operated Domestic as to reduce its effective position as a competitor of American in various cities and states" where both did business. *Id.* The complaint in *Ramsburg* was filed shortly after Domestic mailed a notice to its shareholders advising of a special meeting to consider a proposed merger of the two corporations. *Id.*

In *Ramsburg,* the plaintiffs sought a preliminary injunction to restrain Ameri-

can from voting its "some 80 percent of the common stock of Domestic" in favor of the merger at the special meeting. *Id.* The plaintiffs alleged, in the first count [9] of the complaint, that "the merger would constitute a violation of Section 7 of the Clayton Act, in that its effect would be to lessen substantially competition in commerce." *Id.* While the case was still in district court, the "prayer for relief was changed to a request for an order restraining implementation of the proposed merger during the pendency of the cause." *Id.*

The district court denied the motion for temporary injunction, following which the plaintiffs appealed to the Seventh Circuit Court of Appeals. The opinion recites what happened next:

> On or about the same date, defendants completed the merger by filing certificates of approval with the Secretary of State of Delaware.

*Id.* On appeal, the defendants moved to dismiss on several grounds. *Id.* at 336. As pertinent to the case at bar, the defendants took the position that the matter before the appellate court was moot because "the merger has been completed under the controlling provisions of Delaware law." *Id.* Hence, so the argument went, "no relief [could] be granted plaintiffs." *Id.*

The Seventh Circuit addressed the defendants' argument of mootness as follows:

> This argument must be examined in the light of the inherent power of a court of equity to afford mandatory relief.... [W]here a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo. [T]he rule is framed thus: Where a bill for an injunction has been filed, and the court has acquired jurisdiction of both the person and the subject-matter of the suit, and the defendant does any act which the bill seeks to enjoin, such party acts at his peril and subject to the power of the court to compel a restoration of the status, or to grant such other relief as may be proper under the particular circumstances of the case.

> \* \* \*

> Applying these decisions we are able to formulate the question for determination where, as here, a cause for injunctive relief is met by a contention of mootness because the status of the parties and of their relationship to the subject matter has changed. The decisive issue is whether the subject matter may yet be reached by the mandatory power of equity and the status quo restored. If so, the cause is not moot. And even where the subject matter has been so completely destroyed as to preclude restoration of the status quo, the court still has jurisdiction to grant incidental relief and the cause is not moot.

> Were this an appeal on the merits, therefore, clearly the cause would not be moot. As the court has jurisdiction of the parties and American has possession and control of the assets of Domestic, we would have jurisdiction to compel restoration, if ultimately we should determine that the circumstances of the case require that result.

> And we must conclude, we believe, that our mandatory power is rendered no less effective by the fact that the appeal is taken from an interlocutory order.

*Id.* (citations omitted) (internal quotation marks omitted).

---

9. In the second count, the plaintiffs alleged that they had been damaged by "American's allegedly illegal act in exercising control of" Domestic and sought treble damages and other relief. *Id.*

In rejecting the defendants' argument that the appeal should be dismissed as presenting a moot issue, the Seventh Circuit held as follows:

> The chronology of the circumstances involved in the case at bar indicates that this may be a proper case for a mandatory injunction to restore the status quo. The order denying the temporary injunction was subject to plaintiffs' right to perfect a timely appeal. This they have done. It now appears that defendants completed the merger against which the injunction was sought on, or about, the same day the appealed order was entered. We have jurisdiction of the parties and of the subject matter, i.e., the assets of Domestic, which are in the possession and control of American as the surviving corporation; and we have the power to compel a restoration should our ultimate determination be that the circumstances of the case require that result. The appeal, therefore, is not moot.

*Id.* at 338.

In *Kumar v. Racing Corporation of America, Inc.*, 1991 WL 67083, 1991 Del. Ch. LEXIS 75 (Del. Ch.1991), "certain steps were taken to consummate a cash out merger of [Racing Corporation of America, Inc. ("RCA")] by its majority stockholder." *Id.*, at *1, at *1. A certificate of merger was filed with the Delaware Secretary of State on April 2, 1991. *Id.*, at *4, at 11. On April 12, 1991, the plaintiffs—preferred stockholders of RCA— "sought and obtained a temporary restraining order ... enjoining defendants [i.e., RCA; members of the family who owned controlling interest in RCA before the merger; and TVI Corporation ("TVI"), the corporation through which they owned that interest] from taking any further steps to effectuate the merger." *Id.*, at *1, at *1.

In converting the temporary restraining order into a preliminary injunction in one, but not all, of the "forms" requested by the plaintiffs, the Vice Chancellor concluded that the moving parties had shown a reasonable probability of success on the merits as to two of their three claims. In granting the plaintiffs some of the requested relief while denying it other relief, the Vice Chancellor observed as follows:

> Given the great difficulty, and perhaps practical impossibility, of returning a merged corporation to its original constituent corporations, a preliminary injunction is the conventional remedy when a shareholder establishes that a proposed merger is likely to be found to be in violation of law or of the board's fiduciary obligations.

> Plaintiffs' entire fairness and due care claims appear at this stage of the proceedings to be very strong and our Supreme Court has noted that "a strong showing of success on the merits may compensate for a weak showing of irreparable harm." I am satisfied that such a balancing is appropriate here and that, given the fundamental breaches of fiduciary duty that have been preliminarily established, injunctive relief is appropriate notwithstanding the limited showing of irreparable harm.

> The final question is whether a balancing of the equities tips in favor of plaintiffs. This analysis varies somewhat as to each of the forms of injunctive relief requested. First, plaintiffs seek the continuation of the existing temporary restraint barring defendants from taking any additional steps to consummate the merger. Defendants note that, as long as the merger remains in limbo, RCA's ability to continue as a going concern is questionable. TVI apparently is not prepared to provide more funds until such time as it acquires at least 80%

ownership. Thus, the result of an injunction may be bankruptcy.

I do not discount this possibility, but I also do not find that it would justify allowing the merger to be consummated. RCA has been in financial difficulty from the day TVI first invested in it and TVI has not let RCA go bankrupt up until now. It is unlikely that TVI would change its course at this point since it would face the possibility of having to accept a put of all of plaintiffs' preferred stock under the Stockholders Agreement. In addition, the interests of the public stockholders are very minimal. Under the merger, their total compensation would be approximately $150,000. Arguably, a bond could protect against the injury that the public stockholders might suffer in case of a bankruptcy. Thus, I am satisfied that the first form of injunctive relief requested by plaintiffs should be granted.

*Id.*, at *8-*9, at *22–*24 (citations omitted) (internal quotation marks omitted).

In *Jackson v. Turnbull*, 1994 WL 174668, 1994 Del. Ch. LEXIS · 25 (Del. Ch.1994), L'Nard Restorative Concepts, Inc. ("L'Nard"), had merged with Restorative Care of America, Inc. *Id.*, at *1, at *1. Apparently, as a result of the merger, L'Nard had been merged out of existence. *Id.* After the merger became effective, the plaintiffs—stockholders of L'Nard—executed "written consents" removing all of L'Nard's directors except one of the plaintiffs. *Id.* The plaintiffs brought an action "to determine the rightful directors and officers of [L'Nard]." *Id.* The Vice Chancellor noted that the determination sought by the plaintiffs "is inextricably tied to the claim that the merger was invalid." *Id.*, at *2, at *6.

The plaintiffs in *Jackson* argued that "the merger violated Delaware law in several respects." *Id.*, at *5, at *9. They alleged (1) that the L'Nard board had impermissively delegated to another the board's responsibility to determine the consideration payable to minority stockholders, in violation of *8 Del. C. §§ 141(c) and 251;* (2) that the board had violated *8 Del. C. § 251(c)(7)* by refusing to provide a copy of the merger agreement to stockholders who requested it; and (3) that the board failed to provide appraisal rights as required by *8 Del. C. § 262.* The plaintiffs also alleged two other bases for their complaint, including misrepresentations on the part of the defendants. The Vice Chancellor noted that three of the plaintiffs' five claims alleged statutory violations. One of the claims found *not* to be a statutory violation was the plaintiff Jackson's claim that he "voted in favor of [the merger] *on the basis of defendants' misrepresentations." Id.*, at *5, at *9 (emphasis added). After noting that the three statutory violations were "more than enough to invalidate the merger," *id.*, the Vice Chancellor made no further mention of the misrepresentation claim. The Vice Chancellor then examined each of the three alleged violations of Delaware law and noted that they pertained to "fundamental aspects of our corporation law." *Id.*, at *3 n. 4, at *9 n. 4. The Vice Chancellor concluded the facts showed that each of the three claimed violations of Delaware law was sustained by the proof. *Id.*, at *5, at *5-*6, at *6, at *14, *15–16, *16–18. In a not-so-subtle rebuke to the defendants, the Vice Chancellor responded to their argument pertaining to one of the alleged statutory violations:

> [The defendants] seem to view the Delaware General Corporation Law as a set of guidelines that may be altered or ignored by a corporation, such as this one, that has only a few stockholders. I am aware of no such exemption.

*Id.*, at *6, at *17.

The Vice Chancellor concluded that the merger was void "and that the consents

exercised on July 12, 1993[,] validly removed all of L'Nard's directors except [the plaintiff] Jackson." *Id.*, at *6, at *18.

 We agree with the plaintiff that these three cases stand for the proposition that equity can invalidate a merger *under certain circumstances,* including a case where the merger itself is achieved by the fraudulent acts of the directors. *See also Bokat v. Getty Oil Company,* 262 A.2d 246, 249 (Del.1970) ("If a proposed merger is sought to be used for the cover-up of wrongful acts of management, a Court of Equity in an action making a direct attack on the merger can and will protect the innocent stockholder victim.") *Bokat* is cited in *Lewis* and its "cover-up" language apparently applies to the fraud exception discussed in *Lewis*—an exception that we have held is not implicated by the facts of the instant case. *See Lewis*, 477 A.2d at 1047. Nevertheless, we are persuaded that equity can invalidate a merger depending upon the facts of a given case. We do not believe, however, that the three cases just alluded to in this opinion support the plaintiff's position in the case at bar.

At the outset, we note that each of these cases involves a merger, which, at the time of the decision, was at a preliminary stage, and, therefore, the component parts of the merger were still very much susceptible to being returned to their pre-merger status.

In *Ramsburg*, the court noted that the "decisive issue is whether the subject matter may yet be reached by the mandatory power of equity and the status quo restored." *Id.*, 231 F.2d at 336. The court in *Ramsburg* stated that it had jurisdiction over "the assets of Domestic, which are in the possession and control of American" and hence had "the power to compel a restoration" if the facts warranted. *Id.* at 338.

In *Kumar*, the court noted that

the interests of the public stockholders are very minimal. Under the merger, their total compensation would be approximately $150,000.

*Id.*, 1991 WL 67083, at *9, 1991 Del. Ch. LEXIS 75, at *24. In the instant case, we are dealing with a large number of stockholders and a $1.7 billion merger.

In *Jackson*, the deficiencies relied upon by the plaintiff all went to violations of *specific* requirements of Delaware corporation law *pertaining to mergers.* *Id.*, 1994 WL 174668, at *5, 1994 Del. Ch. LEXIS 25, at *9. That case involved "fundamental aspects of [Delaware] corporation law," *id.*, at *3 n. 4, at *9 n. 4, as it pertained to mergers. As in the other two cases, the court in *Jackson* was not dealing with a merger between publicly-owned companies.

 The plaintiff has not drawn our attention to any Delaware case authority involving claims such as the ones before us in the instant case in the context of a merger of two publicly-owned companies. While some of the language of the three cited cases might appear to be applicable to this case, those cases must be read in the context of their facts. "It is a maxim not to be disregarded that general expressions, in every opinion [,] are to be taken in connection with the case in which those expressions are used." *Nat'l Life & Acc'd Ins. Co. v. Eddings*, 188 Tenn. 512, 221 S.W.2d 695, 699 (1949), quoting the words of Chief Justice John Marshall in the case of *Cohens v. Commonwealth of Virginia*, 6 Wheat. 264, 19 U.S. 264, 5 L.Ed. 257, 290 (1821). We find no legal authority to support the plaintiff's position that its allegations of breach of fiduciary duty/fraud in this case are legally sufficient to invalidate a merger that has occurred and will shortly be fully consummated.

## C. Temporary Injunction

 In the instant case, the trial court's *status quo* order is, in effect, a temporary injunction. The granting of such an injunction is controlled by Tenn. R. Civ. P. 65.04(2):

A temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

In *S. Cent. Tenn. R.R. Authority v. Harakas*, 44 S.W.3d 912 (Tenn.Ct.App.2000), we quoted from Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 4–3(*l*) (1999), as follows:

The most common description of the standard for preliminary injunction in federal and state courts is a four-factor test: (1) the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest.

*Id.*, 44 S.W.3d at 919, n.6. We have determined that the plaintiff has failed to demonstrate "the probability that [it] will succeed on the merits." *Id.*

The plaintiff claims that there was fraud involved in the adjournment of the July 16, 2003, meeting. It claims that the defendants misrepresented the reason for the adjournment. In the view of the plaintiff, the meeting was adjourned because the directors "had counted noses," as it were, and were aware that the company lacked the votes to approve the merger. The plaintiff charges in its brief that the defendants "[t]hwarted a shareholder vote on the merger, and instead used their control over [Old] Clayton Homes' corporate machinery to force an immediate adjournment of the meeting." The plaintiff makes these assertions in an apparent attempt to suggest that the adjourned meeting of July 30, 2003, was in some way tainted by "shenanigans"—the court's word—at the July 16, 2003, meeting.

The plaintiff is attempting to take a position that is inconsistent with a position it took in advance of the July 30, 2003, meeting. On July 29, 2003, it asked the trial court, in the strongest possible terms, to order the defendants not to again adjourn the vote on the merger. The plaintiff asked for a TRO to insure that the meeting on July 30, 2003, would be held and that the vote would be taken. It got what it wanted—a vote was taken. As a direct result of that vote, which the plaintiff asked the court to order, the merger was approved. It now seeks to stop that merger. In other words, it seeks to prevent that which resulted from a vote taken pursuant to an order the plaintiff was responsible for securing. We will not permit the plaintiff to take these inconsistent positions. *See Johnston v. Cincinnati, N.O. & T.P.Ry. Co.*, 146 Tenn. 135, 240 S.W. 429, 436 (1922); *Stamper v. Venable*, 117 Tenn. 557, 97 S.W. 812, 813 (1906); *Stearns Coal & Lumber Co. v. Jamestown Ry. Co.*, 141 Tenn. 203, 208 S.W. 334, 334–35 (1919). Our holding with respect to inconsistent positions should not be interpreted as relieving the directors of liability for breaches of fiduciary duty that occurred prior to, during, or after the vote of July 30, 2003.

It should also be noted that there is nothing in the record before us demonstrating that Old Clayton Homes did anything wrong, or contrary to its bylaws or Delaware law, when it adjourned the meeting of July 16, 2003. On this point, we

agree with Judge Young of the trial court and the comments of Vice Chancellor Stephen P. Lamb in the Orbis Delaware litigation.

The plaintiff also directs our attention to the affidavit of Alan M. Miller. As we noted earlier in this opinion, Mr. Miller was hired by Orbis to review the proxies, the ballots, and the preliminary tabulation of the merger vote.

The significant statements in Mr. Miller's affidavit are as follows:

> Our review of the original proxies began at 11 am EST.... Based upon our review of the proxies, and our prior review of copies of the proxies at IVS Associates, I identified several apparent problems or irregularities.
>
> Certain of the copies of the proxies that I reviewed appear to have reverse sides that were manufactured or attached to the front side by someone other than the person who voted the proxy. For these proxies, the problem is apparent because the front of the proxy that was signed was faxed and had the degraded appearance that one would expect in a fax copy. Attached to the document was a clear copy of the back of a proxy that appeared to be added subsequently. It is my understanding that if only one sided [sic] of the proxy is transmitted, the proxy is invalid. Perhaps even more significant is the fact that the differences between the front and back of these documents indicates that they were altered. Obviously it would be improper for some other individual or entity to attach a back to a proxy that was not properly transmitted.
>
> Several of the proxies voted by members of the Clayton family had problems. The original proxies did not indicate that the proxies were signed by a person with the appropriate capacity to sign the proxies, particularly in connection with the Clayton Family Foundation shares.

> Another copy of the same proxies shows that the information regarding the appropriate capacity was later added, raising serious questions about not only the validity of the vote, but whether the proxies were altered after the fact.
>
> Additional problems or issues that I identified in connection with the proxies include the fact that apparently at least 100,000 votes were recorded by televote by Georgeson Shareholder Communications. In my professional opinion, this election should have been deemed contested and telephonic and internet voting not permitted, as these are less reliable in a contested vote.
>
> Finally, I note that on July 30, the last day of voting on the Merger, the stock took a precipitous drop and that at least 3 million shares flipped from votes against the transaction to votes in favor of the transaction raising additional questions about the validity of those votes.

(Numbering in original omitted).

The merger in this case was approved by a margin of 3,204,608 shares. There is nothing in Mr. Miller's affidavit establishing that a single "no" vote was counted as a "yes" vote. His affidavit is nothing more than a number of general observations, such as "apparent problems or irregularities"; proxies with a "degraded appearance"; a back of a proxy "that *appeared* to be added subsequently"; differences between the front and back of proxies "*indicates* that they were altered" (how this is significant to the vote count he does not say); proxies by members of the Clayton family "had problems"; information added to a proxy at a later time (he doesn't know when) "raising serious questions"; and other vague and general assertions. (Emphasis added). In our judgment, the affidavit establishes nothing.

The plaintiff also relies upon the fact that Kevin T. Clayton, the CEO of Old Clayton Homes, on the day before the meeting of July 16, 2003, learned that an institutional investor—Janus—no longer owned stock in Old Clayton Homes. The plaintiff contends that Mr. Clayton asked Janus to continue to support the merger and not to reveal it had recently discovered that it no longer owned stock in the company.

Assuming that Mr. Clayton did make such a request to Janus, there is nothing in the record to suggest that Janus ever followed through with this request during the period of time before the merger vote was held. Furthermore, there is nothing before us to reflect that any stockholder was influenced by a misrepresentation made by Janus at the request of Mr. Clayton.

Finally, the plaintiff accuses the defendants of destroying evidence of "their efforts to influence shareholders to vote in favor of the merger." We have two responses to this. First, there is nothing fraudulent about urging shareholders to vote in favor of the merger; and, second, the documents in question were lists of stockholders utilized by directors to contact some of those who would be voting on the merger. None of this suggests fraud.

Most significantly, there is not a scintilla of evidence in this record demonstrating that a single vote was incorrectly counted or that any share of stock was voted in favor of the merger because of any alleged fraudulent act of the defendants or that the vote count was not as certified. This strongly militates against the issuance of a temporary injunction.

### D. Conclusion

We conclude that the allegations of breach of fiduciary duty/fraud are legally insufficient to invalidate the merger of these two publicly-owned corporations.

Even if these allegations were deemed to be legally sufficient, the facts before us do not show that there is a probability that the plaintiff will be successful at trial in its efforts to undo the merger. The status quo injunction was not and is not warranted. This now-effective merger should be allowed to continue to completion.

### V. Class Action Claims

 The trial court decreed that the plaintiff's class action claims should proceed below. We agree. A class has not been certified in the Blosser Delaware litigation. That case appears to be the only litigation other than the instant case in which class certification is being sought arising out of the subject merger. We see no reason to stay the instant class action litigation at this time, particularly in view of the fact that the parties have represented to us that Blosser is attempting to be dismissed from the Delaware litigation while the defendants there have taken the unusual step of asking the Vice Chancellor to certify the class.

If, in the future, a new attempt is made to stay this class action suit in favor of one in Delaware, the trial court, in exercising its discretion on this subject, should be guided by the following text from 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 7.31 (3rd ed.1992), quoted with approval in the Tennessee Supreme Court case of *Meighan v. U.S. Sprint Communications Co.,* 942 S.W.2d 476, 481 (Tenn.1997):

> When cases bearing similar class allegations and similar causes of action are pending in different courts, such as different federal and state courts or different state courts, courts should be kept informed of class certification proceedings relating to the same cause of action, and *rarely should the same class be certified on the same cause of action before more than one court, in the absence of special circumstances.*

In determining the superiority of certifying a class in a particular forum, the court should compare the advantages of a class suit in the different fora and should weigh considerations of class scope, tolling of statute of limitations for the benefit of the class, reconciliation of pending individual suits with the certification of a class suit without opt-out rights under Rule 23(b)(1) or (2), whether in fact a class suit is pending in another more favorable forum, certification of a class limited to selected issues or claims, the state of litigation progress in the competing suits, and a host of other factors.

(Emphasis in original).

In determining which of the plaintiff's claims are derivative in nature, and hence barred by the plaintiff's lack of standing, as contrasted with injuries done to the plaintiff and such class members as may be certified, the trial court's attention is called to the excellent discussion on this subject found in the Supreme Court of Delaware's decision in *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348 (Del. 1988).

## VI. *Motion Re Post-judgment Facts*

The plaintiff has filed what it refers to as a motion to consider post-judgment facts. The facts alluded to in the motion do not amount to post-judgment facts under Tenn. R.App. P. 14. The motion is denied.

## VII. *Trial of Class Action Lawsuit*

In view of our decision to vacate the status quo injunction, it is no longer necessary to expedite the trial of the plaintiff's class action suit. That suit shall progress in an orderly manner consistent with the nature of this class action litigation.

## VIII. *Conclusion*

The judgment of the trial court restraining the defendants from action to change the status quo of the subject merger is hereby vacated. The trial court's judgment denying the defendants' motion to stay the plaintiff's stockholders' derivative claims is vacated, and, upon the filing of an appropriate motion as to these claims, the trial court is directed to enter an order dismissing them. The trial court's judgment denying the defendants' motion to stay the plaintiff's class action claims is affirmed. Costs on appeal are taxed to the plaintiff. This case is remanded to the trial court for further proceedings, consistent with this opinion. The effect of this opinion and the order issued pursuant to it is stayed until 4:30 p.m. EDT, September 8, 2003, in order to afford each of the parties an opportunity to request further appellate review by the Supreme Court.

## APPENDIX A

### IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE
### FOR THE FIFTH JUDICIAL DISTRICT AT MARYVILLE

DENVER AREA MEAT CUTTERS AND )
EMPLOYERS PENSION PLAN, )
Derivatively on Behalf of CLAYTON )
HOMES, INC., )
 )
 Plaintiff, )
 )
vs. ) E-19723
 )
JAMES L. CLAYTON, KEVIN T. )
CLAYTON, C. WARREN NEEL, B. JOE )
CLAYTON, STEVEN G. DAVIS, DAN W. )
EVINS, WILMA H. JORDAN, THOMAS )
N. MCADAMS )
 )
 Defendants, )
 )
 and )
 )
CLAYTON HOMES, INC., a Delaware )
Corporation, )
 )
 Nominal Defendant. )

FILED
AUG 18 2003
JAMES A. CARROLL
CLERK &
MASTER

### ORDER

THIS CASE CAME on for further hearing on the 15ᵗʰ day of August, 2003, before the Honorable W. Dale Young, Circuit Judge for the 5ᵗʰ Judicial District, at Maryville, Tennessee.

AT THE CLOSE OF ORAL ARGUMENTS, the Court took the matter under advisement and has rendered its Memorandum, deciding certain issues in the case.

Reference is made to the Court's Memorandum dated August 16, 2003, which Memorandum is incorporated herein by reference as if copied verbatim herein.

**ACCORDINGLY, IT IS ORDERED,** adjudged and decreed by the Court:

(1) Having made a *prima facia* showing of fraud, Plaintiff's Derivative Cause of Action and Class Action Cause of Action will proceed on an expedited basis.

(2) Defendants' Motion to Stay the Derivative Action and Motion to Stay the Class Action are respectfully overruled.

(3) Defendants are hereby restrained from any action to change the *status quo* of the subject merger until further orders of this Court or upon further orders of a superior Court.

(4) After review by applicable superior Court(s), and provided any or all of Plaintiff's causes of action survive, the parties are ordered to prepare for an expedited trial on the merits within thirty (30) to forty-five (45) days from August 16, 2003, at a time agreeable to the parties and to the Court.

**IT IS SO ORDERED.**

This 16th day of August, 2003.

W. DALE YOUNG, CIRCUIT JUDGE

# APPENDIX B

FROM RL&F#1 (THU) 8. 7' 03 7:31/ST. 7:90/NO.4864756922 P 2 *State of Delaware*
*Division of Corporations*
*Delivered 07:29 AM 08/07/2003*
*FILED 07:29 AM 08/07/2003*
*SRV 030514583 - 2697207 FILE*

### CERTIFICATE OF MERGER
### OF
### B MERGER SUB, INC.
### WITH AND INTO
### CLAYTON HOMES, INC.

Pursuant to Section 251 of the General
Corporation Law of the State of Delaware

Clayton Homes, Inc., a Delaware corporation (the "Company"), does hereby certify to the following facts relating to the merger of B Merger Sub, Inc., a Delaware corporation ("Merger Sub"), with and into the Company (the "Merger"):

FIRST: The names and states of incorporation of the constituent corporations to the Merger are as follows:

| Name | State |
|------|-------|
| B Merger Sub, Inc. | Delaware |
| Clayton Homes, Inc. | Delaware |

SECOND: An Agreement and Plan of Merger, by and among Berkshire Hathaway Inc., a Delaware corporation and the sole stockholder of Merger Sub, Merger Sub and the Company, dated as of April 1, 2003, as amended by Amendment No. 1, dated as of July 16, 2003 (the "Merger Agreement"), has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with Section 251 of the General Corporation Law of the State of Delaware.

THIRD: The name of the corporation surviving the Merger (the "Surviving Corporation") is Clayton Homes, Inc.

FOURTH: The Certificate of Incorporation of the Surviving Corporation shall be amended as set forth in Annex A attached hereto.

FIFTH: An executed copy of the Merger Agreement is on file at the offices of the Surviving Corporation, 5000 Clayton Road, Maryville, Tennessee 37804. A copy of the Merger Agreement will be furnished by the Surviving Corporation upon request and without cost, to any stockholder of either constituent corporation.

(THU) 8 7' 03 7:31/ST. 7:29/NO 4864756922 P 3

IN WITNESS WHEREOF, Clayton Homes, Inc. has caused this Certificate of Merger to be executed in its corporate name this __6th__ day of August, 2003.

CLAYTON HOMES, INC.

By: _____
 Kevin T. Clayton
 Chief Executive Officer and President

APPENDIX C

# *Delaware*

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"B MERGER SUB, INC.", A DELAWARE CORPORATION,

WITH AND INTO "CLAYTON HOMES, INC." UNDER THE NAME OF "CLAYTON HOMES, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE SEVENTH DAY OF AUGUST, A.D. 2003, AT 7:29 O'CLOCK A.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Harriet Smith Windsor, Secretary of State

2697207 8100M

030514583

AUTHENTICATION: 2569639