**In the Interest of C.T.G., a Child,**

**Upon the Petition of P.G and T.L.W., Appellants,**

**and**

**Concerning K.R.W., Appellee.**

**No. 05CA0783.**

Colorado Court of Appeals, Div. I.

Aug. 9, 2007.

Certiorari Denied Sept. 11, 2007.

DiGiacomo & Jaggers, LLP, David R. DiGiacomo, Douglas J. Perko, Arvada, Colorado, for Appellants.

Law Offices of Stephen J. Harhai, Sara A. Willhite, Denver, Colorado, for Appellee.

Opinion by Judge ROTHENBERG.

P.G. (father) and T.L.W. (mother) (collectively, the parents) appeal from the trial court's orders denying their request to terminate the parenting time awarded to K.R.W. (stepfather) for their minor child, C.T.G., and the trial court's award of attorney fees to stepfather. Because we conclude that stepfather lacks standing to seek parenting time and that even if he had standing, he would not be entitled to parenting time, we reverse the orders related to stepfather's parenting time and the order awarding him attorney fees, and we remand with directions to grant the parents' motion to terminate visitation.

## I. Background

The basic facts are undisputed. In 1997, while mother and stepfather were married

and living in Minnesota, she had intimate relations with father and became pregnant. C.T.G. was born on August 12, 1998. In 1999, mother and father learned that father was the biological father of the child, but stepfather was not informed of this fact until 2001 when father filed a paternity action and tests were conducted.

In 2002, the Minnesota court decreed that father was the biological father and awarded joint legal custody of C.T.G. to father and mother, with sole physical custody to mother. The court's order also provided that stepfather would have visitation "on an interim basis to be established by the parties and a guardian ad litem pending further agreement or court orders." During that same year, mother and stepfather separated.

In 2003, the marriage between mother and stepfather was dissolved in Minnesota. Mother and father were then living together with the child and had relocated to Colorado, and stepfather traveled to Colorado one weekend per month to visit the child. The parents married in 2005.

Minor problems arose during stepfather's visits in Colorado, which escalated in early 2005 when mother and stepfather had an altercation. Mother reportedly became angry and pushed or slapped stepfather as he was returning the child after a visit. He filed a complaint against her at a nearby police station, and she was arrested later that day in the presence of the child. According to the parents, this resulted in considerable trauma to the child, who began expressing fear that stepfather would have mother arrested again and displaying physical symptoms when it was time for visitation.

In February 2005, the parents filed an emergency motion to suspend stepfather's visitation, and jurisdiction was transferred from Minnesota to Colorado. Stepfather filed a motion to enforce parenting time pursuant to § 14–10–129.5, C.R.S.2006 (addressing disputes concerning parenting time). Following a brief evidentiary hearing, the trial court reinstated stepfather's visitation of one weekend per month, finding he was a "psychological parent" to C.T.G. at the time of the Minnesota order and the termination

of his relationship with her would likely result in psychological harm to her.

The parents then filed a motion to terminate stepfather's visitation rights, and the court conducted a full evidentiary hearing. Following that hearing, the trial court found that (1) stepfather is a psychological parent to C.T.G.; (2) the child is not in any danger of emotional or physical harm when she is with him; (3) the parents' actions created stress around the visits; and (4) their attempts to eliminate stepfather's contact with the child endangered her emotional development. The court ordered stepfather's parenting time to continue. The parents appeal from that ruling.

## II. Standing

■ The parents contend stepfather lacks standing to assert parenting time rights in this case. Relying largely on *In re E.L.M.C.,* 100 P.3d 546 (Colo.App.2004), stepfather contends his status as a "psychological parent" to C.T.G. conferred standing on him. We agree with the parents.

### A. General Principles

■ "The question of standing involves a consideration of whether a plaintiff has asserted a legal basis on which a claim for relief can be predicated." *Bd. of County Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1052 (Colo.1992). Standing therefore is that concept of justiciability that is concerned with whether a particular person may raise legal arguments or claims. *See Romer v. Bd. of County Comm'rs,* 956 P.2d 566, 572 (Colo.1998) (citing *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968)); *Stamford Hosp. v. Vega,* 236 Conn. 646, 657, 674 A.2d 821, 828 (1996) ("Standing is the legal right to set judicial machinery in motion." (quoting *Tomlinson v. Bd. of Educ.,* 226 Conn. 704, 717, 629 A.2d 333, 341 (1993))).

Standing may be lost for many reasons. As the United States Supreme Court has observed, the doctrine of standing requires that an individual "maintain a 'personal stake' in the outcome of the litigation throughout its course." *Gollust v. Mendell,* 501 U.S. 115, 126, 111 S.Ct. 2173, 2180, 115

L.Ed.2d 109, 121 (1991) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395–97, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980)); *see In re Marriage of Yates,* 148 P.3d 304, 314 (Colo.App.2006)("[W]hile husband had standing to litigate the division of marital property in the trial court, he lost standing to pursue the issue on appeal." (emphasis added)); *In re Baby Boy K.,* 546 N.W.2d 86, 102 (S.D.1996)(concluding alleged biological father had standing to assert claim that his potential liberty interest as parent had been infringed by termination of parental rights without sufficient notice, but he lost standing to assert a motion to vacate the termination order after he failed to assert his parental right within the statutory time period following the child's birth); *cf. Branick v. Downey Sav. & Loan Ass'n,* 39 Cal.4th 235, 243, 46 Cal.Rptr.3d 66, 138 P.3d 214, 218 (2006)(concluding plaintiff in pending unfair competition case lost standing by intervening adoption of state constitutional amendment); *Chamberlain v. Farm Bureau Mut. Ins. Co.,* 36 Kan.App.2d 163, 174, 137 P.3d 1081, 1089 (2006) (concluding plaintiff lost standing as representative plaintiff for class action claims against an automobile insurer to recover personal injury protection benefits when she settled with the alleged tortfeasor and his insurer); *Denver Area Meat Cutters & Employers Pension Plan v. Clayton,* 120 S.W.3d 841 (Tenn.Ct.App.2003) (concluding plaintiff lost standing to pursue its stockholders' derivative suit after merger occurred).

### B. Nonparents' Statutory Standing

At common law, third parties such as grandparents, stepparents, and siblings, had no custody or visitation rights and therefore no standing to assert such rights. *In re R.A.,* 121 P.3d 295, 298 (Colo.App.2005), *rev'd on other grounds sub nom. In re Adoption of C.A.,* 137 P.3d 318 (Colo.2006); *In re Hood,* 252 Kan. 689, 692–93, 847 P.2d 1300, 1303 (1993); *see Kulla v. McNulty,* 472 N.W.2d 175, 181–82 (Minn.Ct.App.1991)(holding that, but for the legislative enactment of Minn. Stat. § 257.022(2)(b) (now § 257C.08(2)(b)) a nonparent would have no right to visitation whatsoever).

This principle is based on the constitutionally protected right of parents to determine how their children will be raised. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (recognizing that parents have a protected liberty interest in the care, custody, and control of their children and that this fundamental right encompasses the presumption that a fit parent will act in the best interests of his or her child); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Hede v. Gilstrap,* 107 P.3d 158, 173–74 (Wyo. 2005)("The parents' obligation to allow visitation with the grandparent was characterized as a moral, not a legal, obligation." (quoting *Ward v. Ward,* 537 A.2d 1063, 1066–69 (Del. Fam.Ct.1987))).

In *People in Interest of E.S.,* 49 P.3d 1221, 1223 (Colo.App.2002), a division of this court rejected the contention that a stepparent has a fundamental liberty interest in the care, custody, and control of his or her stepchild and is therefore entitled to constitutional due process protections, including the right to be heard and to defend against a petition in dependency and neglect. The division expressed its concern that "to extend such an interest where, as here, the rights of both of the natural parents are intact could create an untenable conflict by pitting the rights of a stepparent against those of the natural or adoptive parents, which would compromise the welfare of the child." *People in Interest of E.S., supra,* 49 P.3d at 1223.

By 2005, all fifty states had enacted statutes conferring on grandparents the right to seek visitation with their grandchildren in various situations. *See* § 19–11–17(1), C.R.S. 2006; F. McGuane, K. Hogan & B. Storey, 19 *Colorado Practice* §§ 28.11, 28.45 (2006).

Some states, *not* including Colorado, have also enacted statutes expressly recognizing and delineating the rights of other caregivers, such as stepparents, to seek custody or visitation with children with whom they have a close bond. *See In re Marriage of Riggs,* 35 Kan.App.2d 61, 64, 129 P.3d 601, 604 (2006)(relying on Kan. Stat. Ann. § 60–1616(b), which provides that grandparents and stepparents may be granted visitation

rights). As the Pennsylvania Supreme Court stated:

It is well-established that there is a stringent test for standing in third-party suits for visitation or partial custody due to the respect for the traditionally strong right of parents to raise their children as they see fit. *The courts generally find standing in third-party visitation and custody cases only where the legislature specifically authorizes the cause of action.*

*Peters v. Costello,* 586 Pa. 102, 111, 891 A.2d 705, 710 (2005) (emphasis added; footnote and citation omitted).

The Iowa Supreme Court has also refused to extend visitation to third parties, absent a statute permitting such visitation. The court stated the reasons:

The only exception to the common law rule [in Iowa] is a statutory one that allows grandparents visitation under limited circumstances specified in the statute. *See* Iowa Code § 598.35 . . . .

This court, in *Olds [v. Olds,* 356 N.W.2d 571, 574 (Iowa 1984) ] cited sound policy reasons for limiting visitation with third parties other than a noncustodial parent. Such a limitation "demonstrates a respect for family privacy and parental autonomy. The rule recognizes that the government is ill-equipped to dictate the details of social interaction among family members. It also recognizes that the parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion."

. . . "[The] judicial enforcement of visitation [by third-parties] would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and ill feelings" between the parent and other persons, and "coerce what should remain a moral rather than legal obligation."

. . . "[W]e would have no clear guidelines as to where such [third-party] visitation should stop. For example, claims for visitation could arise from siblings, aunts, uncles, and other persons with special relationships. With so many potential petitioners, a court would have to decide which petitioners are more deserving of

visitation than others, and how much time each petitioner should receive with the child. It could be chaotic, at best, assigning so many diverse visitations to an already limited number of weekends and holidays."

*In re Ash,* 507 N.W.2d 400, 402–03 (Iowa 1993)(additional citations omitted; quoting *Lihs v. Lihs,* 504 N.W.2d 890, 893 (Iowa 1993)).

In Colorado, the General Assembly has spoken and has established only limited circumstances in which a person other than a parent may be awarded visitation rights to a child. Section 14–10–123(1), C.R.S.2006, as pertinent here, permits a proceeding for the allocation of parental responsibility to be filed:

(b) *By a person other than a parent,* by filing a petition seeking the allocation of parental responsibilities for the child in the county where the child is permanently resident or where the child is found, but only if the child is not in the physical care of one of the child's parents; [or]

(c) *By a person other than a parent* who has had the physical care of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care.

(Emphasis added.)

It is undisputed that stepfather and mother separated in 2002, that stepfather has not had physical care of the child since then, that his motion for visitation was filed in Colorado in 2005, and that it was not filed within six months of the termination of his physical care of the child. Thus, the requirements of § 14–10–123(1) were not satisfied.

In reaching our conclusion, we acknowledge that there is a narrow exception to standing for defendants who may "assert an affirmative defense in response to a complaint." *Mortgage Invs. Corp. v. Battle Mountain Corp.,* 70 P.3d 1176, 1182 (Colo. 2003); *see People ex rel. Simpson v. Highland Irrigation Co.,* 893 P.2d 122–127 (Colo. 1995) ("[O]nce the plaintiff has established standing and the defendants have been haled into court by the plaintiff, the only role for the defendants is to defend against the suit.

The defendants' affirmative defense does not constitute an independent cause of action, but it is a defensive claim only."); *People in Interest of J.C.S.*, 169 P.3d 240 (Colo.App. 2007).

Here, however, stepfather did not assert an affirmative defense to the parents' motion to terminate his visitation. He sought affirmative relief analogous to a counterclaim by requesting a permanent award of visitation over the objections of the parents. Nor has he argued on appeal that he falls within this limited exception to standing. Thus, the fact that the parents initially sought termination of his alleged visitation order does not affect our conclusion that he lacks standing. *See People in Interest of J.C.S., supra.*

## C. "Psychological Parent"

The trial court here accepted stepfather's argument that his status as a "psychological parent" gives him standing to request an award of visitation in this action. However, contrary to the stepfather's contention, the "psychological parent" concept is not an independent and all-inclusive grant of standing that permits third parties to seek the custody or visitation of another person's child. Nor does the trial court's finding that stepfather was or is a "psychological parent" to C.T.G. place him on equal footing with the natural parents. *See E.L.M.C., supra,* 100 P.3d at 561 ("[B]ecause [the adoptive parent] is exercising a constitutional parental right and, under present law, [the co-parent] is not, they do not stand before us on equal footing."); *cf.* § 14–10–129(1)(b)(I), C.R.S.2006 (providing that *a parent's right* to visitation of his or her child may not be restricted unless the court finds "the parenting time would endanger the child's physical health or significantly impair the child's emotional development").

The "psychological parent" concept is simply a limited grant of standing that the Colorado legislature has incorporated in § 14–10–123(1)(c), and it has specific requirements that must be met. Hence, a nonparent seeking to qualify as a "psychological parent" and establish standing in Colorado on that basis must satisfy those requirements and show that he or she "has had the physical care of

[the] child for a period of six months or more, [and has commenced the action] within six months of the termination of such physical care." Section 1410123(1)(c); *see In re V.R.P.F.*, 939 P.2d 512, 514 (Colo.App.1997) ("The statutory grant of standing to a nonparent to seek legal custody of a child constitutes legislative recognition of the importance of 'psychological parenting' to the best interests of a child."); *In re Custody of C.C.R.S.*, 872 P.2d 1337 (Colo.App.1993), *aff'd,* 892 P.2d 246 (Colo.1995); *see also* Alan Stephens, Annotation, *Parental Rights of Man who is not Biological or Adoptive Father of Child but was Husband or Cohabitant of Mother When Child was Conceived or Born,* 84 A.L.R.4th 655 (1991).

In *In re K.M.B.,* 80 P.3d 914 (Colo.App. 2003), a division of this court discussed the interplay between the two subsections of § 14–10–123(1):

[Section] 14–10–123(1)(b) was adopted verbatim from section 401(d) of the Uniform Dissolution of Marriage Act, and courts of other jurisdictions that have adopted the Uniform Act read the provision the same way.

Subsection (c), which was adopted later and is not contained in the Uniform Act, implements the Colorado General Assembly's recognition of "psychological parenting." *It gives standing only to those nonparents who have had physical care of the child for at least six months and who have commenced a proceeding for parental responsibility no more than six months after the child left their physical care.* Subsection (c) acknowledges the important attachments that can arise when the child has been in the physical care of a nonparent, as well as the possible attenuation of the parent-child bond that can occur under such circumstances.

The [United States] Supreme Court has held that a statute permitting any person to petition for visitation with a child living with a parent violated the substantive due process right of that parent to rear his or her children. *Troxel v. Granville [supra].* Thus, subsection (c) appropriately restricts standing because it applies even when the child's parents have retained some meas-

ure of caretaking responsibility. Limiting the class of nonparents who may seek parental responsibilities to only those individuals who have had a recent or continuing role as a caretaker protects against undue interference with the parent-child relationship.

Conversely, because standing may be acquired under subsection (b) only when a parent is no longer caring for the child, no such due process problem appears to be implicated.

*In Interest of K.M.B., supra,* 80 P.3d at 916–17 (emphasis added; citations omitted); *see In re V.R.P.F., supra,* 939 P.2d at 513 (holding that grandparents lacked standing to seek custody of a grandchild under § 14–10–123(1)(c), because the child's mother had physical custody of him when the grandparents filed their petition, and the grandparents had not had physical custody of him for at least six months).

Stepfather's reliance on *In re E.L.M.C., supra,* is misplaced. The parties there, a same-sex female couple, lived in a committed relationship for eleven years before the action was filed. During that time, they sought joint adoption of a child from China but were informed that an adoption by a same-sex couple was not feasible. For this reason, the adoption papers were made out in the name of only one of the women (the adoptive mother) and did not name the co-parent. After the adoption, however, the couple filed a joint "Petition for Custody" under § 14–10–123, C.R.S.2006, expressing their intent to have the child raised by both women as one family with two parents. The district court awarded joint custody of the child to both women, and both were listed as mothers of the child in the school directory.

Approximately five years after the joint custody award and six years after the adoption, the relationship began to fail, and a dispute over parenting time arose. The adoptive mother sought to restrict the co-parent's visitation in 2003 and 2004 and to terminate all court-ordered parenting time in 2005. The co-parent petitioned for roughly equal parenting time. A magistrate declared the joint custody order void, but temporarily ordered joint parenting time and joint deci-

sion-making. At the hearing on permanent orders, the trial court concluded that jurisdiction over the initial joint custody proceedings was proper and awarded joint parental responsibilities to the co-parent with certain limitations not relevant here.

On appeal, as relevant here, a division of this court upheld the trial court's finding that both women were psychological parents under § 14–10–123(1)(c), and that the co-parent had standing to bring the action because she had shown the existence of a "parent-like" relationship. The division concluded the co-parent's physical possession and control of the child did not have to be exclusive because there was undisputed evidence of her recent and longstanding physical care of the child.

Subsection (1)(c) limits jurisdiction to the "class of nonparents who may seek parental responsibilities to only those individuals who have had a recent or continuing role as a caretaker" and thereby "protects against undue interference with the parent-child relationship." *In re K.M.B., supra,* 80 P.3d at 917. Thus, proof of the nature of a parent-like relationship between a person seeking parental responsibilities and the child provides the restrictive jurisdictional safeguards necessary to prevent families from having to defend against unjustified petitions for parental responsibilities. *See Troxel, supra.*

. . . .

The importance of a psychological parent to the child has long been considered in applying Colorado's best interests of the child standard. [*In re Custody of] C.C.R.S., supra* (determining in a custody contest between biological parents and psychological parents, best interests of child standard is prevailing determination); *Root v. Allen,* 151 Colo. 311, 377 P.2d 117 (1962) (if child were to leave her psychological father with whom she lived for many years, effect would be very damaging); *Devlin v. Huffman,* 139 Colo. 417, 339 P.2d 1008 (1959) (grandparents who had physical custody of children for six months awarded custody based on best interests of child); *Coulter v. Coulter,* 141 Colo. 237, 347 P.2d 492 (1959) (paternal grandmother awarded custody over natu-

ral, fit mother); *In re K.M.B., supra* (recognizing benefits of psychological parent to child); *In re Marriage of Martin,* 42 P.3d 75 (Colo.App.2002) (defining psychological parent and noting potential for harm to child in break-up of relationship). *E.L.M.C., supra,* 100 P.3d at 553, 559.

Notably, in every case relied upon by the division in *E.L.M.C.* where custody or visitation was granted to a nonparent, the child was actually living with the nonparent at the time the petition was filed and had been living there for years. *See Root v. Allen, supra* (child had lived with stepfather for years and was living there when biological father sought custody); *Devlin v. Huffman, supra* (children had been living with grandmother for six years when mother sought their return); *Coulter v. Coulter, supra* (same); *see also In re Custody of C.C.R.S., supra* (petitioners were prospective adoptive parents who had exclusive physical custody of the child for the first six months of his life and who had exclusive care of him when they initiated the custody proceedings).

In *Middleton v. Johnson,* 369 S.C. 585, 633 S.E.2d 162 (S.C.Ct.App.2006), the South Carolina Court of Appeals concluded a mother's former boyfriend was a "psychological parent" and had standing to seek visitation under a state statute, which conferred upon the family court exclusive jurisdiction to award custody or visitation of a child "to either spouse, or to any other proper person or institution." The court determined, as relevant here, that the ex-boyfriend met the requirement in the psychological parent test that the child and psychological parent reside together, because "[the child] spent at least half of any given week residing with Middleton. [And the child] had his own room, clothes, and school books in Middleton's house." *Middleton, supra,* 369 S.C. at 599–600, 633 S.E.2d at 170.

Nevertheless, the court construed the standing requirement of a nonparent narrowly, adding that "when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life." *Middleton, supra,* 369 S.C. at 598, 633 S.E.2d at 169.

In *In Interest of L.F.,* 121 P.3d 267 (Colo. App.2005), another division of this court rejected a grandmother's argument that she had standing to seek an allocation of parental responsibilities based on her assertion that she and her grandchild had a psychological bond. The division explained the constitutional and policy reasons why a putative "psychological parent" lacks standing unless the jurisdictional requirements of § 14–10–123(1)(c) are satisfied:

> We recognize that children can develop bonds with members of their immediate and extended families, family and nonfamily caregivers, teachers, and others who nurture them. In some instances, the bond between a child and a nonparent may become quite strong. *However, for purposes of standing, the essential issue is whether the petitioner had "physical care" of the child as required by the statute, not whether the child formed a bond with the caregiver.*

> Granting standing under § 14–10–123(1)(c) to those who care for and nurture a child at the request of and under the ongoing direction and control of the parents could be disruptive of the parent-child relationship and implicate the parents' decision-making rights, regardless of whether the caregiver developed a bond with the child. It could also burden parents who continue to exercise their decision-making rights with the threat that those who provide care at their discretion and under their direction would be able to initiate emotionally and financially costly litigation.

*In Interest of L.F., supra,* 121 P.3d at 272 (emphasis added).

Here, even if we assume stepfather was a "psychological parent" of the child when he lived with her and mother in Minnesota, it is undisputed that the child was not living with him in 2005 when he filed his motion for visitation in Colorado and had not lived with him for over three years. Thus, any arguable standing he might have had was lost.

Accordingly, we conclude as a matter of law that stepfather failed to satisfy the requirements of § 14–10–123(1)(c), and he lacks standing to request visitation of the

child. This was a sufficient basis on which to deny his motion for visitation.

### IV. Other Contentions

There are several additional reasons why the trial court erred as a matter of law in granting visitation to stepfather, and we address them next.

### A. Minnesota Order

■ We agree with the parents' contention that the trial court erred in characterizing the visitation awarded to stepfather in the Minnesota paternity decree and order as a permanent order.

■ Whether the court has applied the correct legal standard in making its findings is a question of law that we review de novo. *People in Interest of J.R.T.*, 55 P.3d 217, 219 (Colo.App.2002), *aff'd*, 70 P.3d 474 (Colo. 2003).

■ Whether an order for allocation of parental responsibility or custody is temporary or final is determined from the substance and effect of the order. *In re Marriage of Murphy*, 834 P.2d 1287 (Colo.App. 1992), *disapproved of on other grounds by In re Marriage of Wall*, 868 P.2d 387 (Colo. 1994). Permanent orders establish parental rights that stay in effect until one party establishes a change in circumstances sufficient to support a modification. Temporary orders regarding parenting time and decision-making responsibility are intended to determine those matters pending final orders, and they do not carry res judicata (claim preclusion) effect. *In re Marriage of Fickling*, 100 P.3d 571 (Colo.App.2004).

In *Fickling*, *supra*, 100 P.3d at 572–73, the parents entered into a stipulated parenting plan which provided that the child would alternate between the mother's and the father's residences on a weekly basis. However, the trial court entered permanent orders significantly reducing the amount of overnights the child spent with the father. The father appealed, contending the trial court erred as a matter of law by substantially reducing his parenting time and by applying the best interests of the child standard instead of the endangerment standard in § 14–10–129(1)(b)(I). The endangerment statute provides, in pertinent part:

> The court shall not modify a prior order concerning parenting time that substantially changes the parenting time as well as changes the party with whom the child resides a majority of the time unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child . . . and that the modification is necessary to serve the best interests of the child. In applying these standards, the court shall retain the parenting time schedule established in the prior decree unless:
>
> . . .
>
> (d) *The child's present environment endangers the child's physical health or significantly impairs the child's emotional development* and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

Section 14–10–129(2), C.R.S.2006 (emphasis added).

A division of this court rejected the father's contention, concluding the parties' stipulated agreement for parenting time was a temporary order. It was therefore modifiable under the best interests of the child standard of § 14–10–124(1.5), C.R.S.2006, which has historically been applied to original determinations of parental responsibility. *Fickling*, *supra*, 100 P.3d at 574; *see In re Marriage of Monteil*, 960 P.2d 717 (Colo.App.1998)(addressing former version of statute which allocated physical and legal custody).

The division in *Fickling* explained the difference between temporary and permanent visitation in family law cases:

> Temporary orders regarding parenting time and decision-making responsibility are intended to determine those matters pending final orders. *Temporary orders are not determinative of the permanent orders regarding allocation of parental responsibility or other matters.*

... [T]emporary orders do not grant "parenting time rights" as that term is specified in § 14–10–129(1)(b)(I), but simply provide for parenting time pending a final determination at permanent orders. While temporary orders are enforceable, we do not view them in the same way we view permanent orders, which establish rights in connection with the decree of dissolution that stay in effect until one party establishes a change in circumstances....

*Only permanent orders grant "parenting time rights."* Therefore, the question whether a restriction has occurred in parenting time need be answered only when permanent, not temporary, orders are modified. To hold otherwise would undermine the role that stipulations and temporary orders play in family law.

*Fickling, supra,* 100 P.3d at 574 (emphasis added; citations omitted).

Here, stepfather contends the Minnesota paternity order and decree "terminated any temporary orders and its provisions regarding [his] visitation should be viewed as a permanent order." However, the Minnesota court fully adjudicated the issue of paternity, awarded joint custody of C.T.G. to the parents, and awarded sole physical custody to mother, "subject to a schedule of parenting time to be established for [father]." But as to stepfather, the parenting order stated:

[T]he parties have not reached agreement on a permanent parenting time schedule for [father] or [stepfather], as establishing the relationship of [the child] with her father is in a transitional stage at the present time, coupled with the difficulties experienced by the child relative to the separation and pending dissolution of marriage of [mother and stepfather]. *The parties have agreed to maintain the interim schedule for [father] and [stepfather] in consultation with the guardian ad litem and work towards a permanent schedule* for [father] and [stepfather]. Further, a permanent schedule cannot be presently developed, given the uncertainties surrounding the possible relocations of [fa-

ther] and/or [mother] from the State of Minnesota.

(Emphasis added.)

The paternity order also contained a section entitled "Temporary Step–Parent Visitation Rights" which provided: "The parenting time schedule for [stepfather] shall continue *on the interim basis* established by the parties with the guardian ad litem, pending further agreements of the parties or court order." (Emphasis added.) The Minnesota court thus recognized the need for future changes in the visitation schedule because of the parents' anticipated relocation. *See Johnson v. Johnson,* 223 Minn. 420, 428, 27 N.W.2d 289, 293–94 (1947) (recognizing that orders affecting custody and the maintenance of children are not final).

Interim is defined as "[d]one, made, or occurring for an intervening time; *temporary or provisional." Black's Law Dictionary* 832 (8th ed.2004)(emphasis added).

Contrary to stepfather's contention, the Minnesota paternity order did not terminate any temporary orders regarding visitation, because there were none. The Minnesota order merely created an interim schedule and clearly put stepfather on notice that the visitation order was temporary and needed to be finalized in the future. Stepfather had a full and fair opportunity to request a permanent visitation order soon afterwards in two forums: (1) from the court that issued the paternity decree, or (2) from the court that dissolved his marriage to mother in 2003. He did not do so.

We therefore conclude that while the Minnesota paternity decree operated as a final order and permanent allocation as to paternity and custody, its award of parenting time to stepfather was a temporary order. *See Fickling, supra.* The fact that the parties adhered to the schedule for nearly three years does not change the nature of the order. We would reach the same conclusion applying Minnesota or Colorado law.

Accordingly, the trial court erred in treating the Minnesota order as a permanent order subject to modification, and in requiring the parents to show that endangerment to the child would result from stepfather's

visitation. In ruling on the parties' motions, the court should have applied the standard for an original determination of visitation which is based on the best interests of the child. *See Fickling, supra,* 100 P.3d at 574.

## B. Due Process Requirements

■ We also conclude the trial court erred by failing to afford the parents their due process rights because the court did not presume the parents were acting in the child's best interests, but instead placed upon them the burden of demonstrating that visitation with stepfather would endanger the child; the court did not find that "special circumstances" existed which justified the intrusion on the parents' rights; and the court did not apply a clear and convincing evidence standard.

*Troxel, supra,* was announced five years before the hearings were conducted in this case, and several reported Colorado decisions had already addressed its impact on family law cases. In *Troxel,* a plurality of the United States Supreme Court held that parents have a protected liberty interest in the care, custody, and control of their children and that this fundamental right of parents encompasses the presumption that a fit parent will act in the best interests of his or her child. *See In re Adoption of C.A., supra,* 137 P.3d at 324. Therefore, the Supreme Court concluded some special weight must be accorded to a parent's own determination of when visitation with a child's grandparent, or other third parties, should be permitted. As the Court stated, "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel, supra,* 530 U.S. at 68–69, 120 S.Ct. at 2061 (citing *Reno v. Flores,* 507 U.S. 292, 304, 113 S.Ct. 1439, 1448, 123 L.Ed.2d 1 (1993)).

In *In re Custody of C.M.,* 74 P.3d 342 (Colo.App.2002), a division of this court upheld the constitutionality of Colorado's grandparent visitation statute, § 19–1–117, C.R.S.2006, when applied in conjunction with § 14–10–124(1.5) (requiring the court to consider the wishes of the child's parents as to parenting time). But the division concluded that the biological parents' decisions must carry special weight and significance, and that the parents need not prove that grandparent visitation would adversely affect the child. *See E.L.M.C., supra,* 100 P.3d at 553, 559; *In re R.A.,* 66 P.3d 146 (Colo.App.2002)(rejecting adoptive parents' constitutional challenge to grandparent visitation statute, and concluding grandparents did not have to show the adoptive parents were unfit before the best interests analysis was undertaken in a visitation case); Marie Avery Moses, *The Constitutionality of Colorado's Grandparent Visitation and Third-Party Standing Statutes,* 32 Colo. Law. 51, 54 (Feb.2003).

In *C.A., supra,* which was announced after the hearings were conducted in this case, the Colorado Supreme Court clarified how the special weight prescribed in *Troxel* is to be defined in the context of grandparent visitation. The court in *C.A.* rejected a standard that required a showing of unfitness or emotional harm, but held that trial courts must presume that parental determinations are in the child's best interests and specified that this presumption could only be rebutted by clear and convincing evidence that the parent is unfit to make the visitation decision or the parent's visitation decision is not in the child's best interests. *C.A., supra,* 137 P.3d at 327–28; *see People v. Taylor,* 618 P.2d 1127 (Colo.1980) (proof by "clear and convincing evidence" is proof which persuades the trier of fact that the truth of the contention is highly likely; it is evidence which is stronger than a preponderance of the evidence).

The supreme court added the following statement in *C.A.* about the type of proof needed when a third-party seeks visitation, and we find it instructive:

> This is not a case where the [g]randparents sought a visitation order simply on an assertion that the grandchild will benefit from grandparent visitation. In such an instance, courts must refrain from considering the grandparent[s'] petition. *See Lulay v. Lulay,* 193 Ill.2d 455, 250 Ill.Dec.

758, 739 N.E.2d 521, 533 (2000)("Generalizations about whether grandparent visitation is beneficial to the children are not determinative of this case."); *In re Herbst,* 971 P.2d [395,] 399 [ (Okla.1998) ] ("[A] vague generalization about the positive influence many grandparents have upon their grandchildren falls far short of the necessary showing of harm which would warrant the state's interference with this parental decision regarding who may see a child."); *Glidden v. Conley,* 175 Vt. 111, 820 A.2d 197, 205 (2003) ("That a child might benefit from contact with a grandparent … [is] not the kind of compelling circumstance [ ] contemplated by the Constitution or this decision.").

*C.A., supra,* 137 P.3d at 328 (emphasis added).

■ Here, stepfather's case basically rests on his assertion that the child will benefit from visitation with him, which is precisely the type of assertion the supreme court instructed lower courts to refrain from considering. *C.A., supra,* 137 P.3d at 327. Furthermore, we conclude as a matter of law that he failed to show or proffer "special circumstances" that would justify his continued visitation with the child over the objections of the parents. *See Camburn v. Smith,* 355 S.C. 574, 580, 586 S.E.2d 565, 568 (2003)(reversing an order granting visitation to the grandparents where the children were well-cared for by both parents because "the [trial] court erroneously required these parents to 'justify' their decision and found those reasons unsatisfactory." *Compare In re Marriage of Wilson,* 199 Or.App. 242, 249, 110 P.3d 1106, 1109 (2005)(reversing a custody award to the child's stepfather); court concluded he failed to rebut the presumption required by *Troxel* and rejected his request for a remand "for further development of the record"); *with Middleton, supra,* 369 S.C. at 604, 633 S.E.2d at 172 (concluding there was overwhelming evidence of compelling circumstances to overcome the presumption that the mother's decisions to deny her ex-boyfriend's visitation with child was in child's best interests).

At the time of the hearings in this case, the parents and the child were residing in Colorado, the child was of school age, her father was a stay-at-home father, and there was uncontradicted expert testimony that her ties to him had been strengthened while those to stepfather appeared to have been dissipated by time and distance.

The guardian ad litem in Minnesota (a family attorney) stated during her testimony by telephone that she had not seen or spoken to the child since the family moved to Colorado in 2002, and neither the report of the special advocate nor that of the parental responsibility evaluator supports a finding that continued visitation was in the child's best interests, much less that termination of stepfather's parenting time would psychologically harm her by impairing her emotional development.

Dr. Lee Hockman, a licensed psychologist, was the only expert who testified at the hearing, and he stated, as relevant here, that: (1) the child told him in interviews she does *not* want to visit stepfather; (2) the significance of her bond with stepfather "has been affected by the last … four and a half years," and he is a less significant emotional figure than he had been in the past; (3) father "has increasingly become a significant and a consistent father figure to the child," and he has always been at least privately opposed to the visits; (5) in terms of the child's attachment, stepfather's "significance is different"; and (6) at times stepfather shows a lack of empathy for the child and minimizes the degree of her stress. Dr. Hockman also observed that the parties "have different versions of the truth in this case," and that the child "gets exposed to different perspectives of it, that keep her constantly in the middle," and expressed his opinion that the parents actually "believe this is best for [the child], that she not have a relationship with [stepfather]."

Although the child's current therapist did not testify, the record contains a letter from her stating: (1) the child had been in that expert's care "off and on since she arrived in Colorado"; (2) there was stress for the child "around [stepfather's] visits and has been since their onset"; (3) the child "has now well adjusted to the family she experiences with [the parents] and [she] gets frustrated when

that is interrupted"; (4) the child expressed to the therapist that "she would like not to see [stepfather] again"; and (5) "[a]n environment with little stress and conflict would be the healthiest for [her]."

The trial court criticized the parents' motives in discouraging the child's relationship with stepfather, concluding they were based on the parents' concern about their reputations and their inability to recognize the harm they were causing by sabotaging the visits and creating stress for her. The trial court also stated that the parties had created this problem and that the child would have to live with this confusion for the rest of her life.

However, while we agree with the trial court that the parents may have made unwise decisions in the past, this does not provide a reason to continue stepfather's visitation where, as here, the parents oppose it, and the record is devoid of evidence showing "special circumstances" that would justify his indefinite visitation with the child over their objections. We perceive no basis for embroiling the child in an indeterminate, confusing, and stressful situation based on this record. *See Commonwealth ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180, 1181–82 (1983)(refusing to grant the grandparents visitation because the animosity between the father and the grandparents may place the child "in a crossfire between conflicting adults which would certainly not be in her best interests"); *In re Custody of Thompson*, 34 Wash.App. 643, 663 P.2d 164, 165 (1983)(agreeing with trial court's conclusion that visitation would not be in the child's "best interest because it would place her in a position of being continually exposed to the hostile feelings between her mother and grandparents").

*Middleton, supra,* offers us guidance because in that case the South Carolina Court of Appeals considered the type of special circumstances that would warrant visitation by a third person over the parents' objection. As previously noted, the court concluded Middleton had standing to seek visitation under the applicable state statute because the child had lived with Middleton at least half of the week for most of his life. The court further observed:

... Middleton assumed the obligations of parenthood by taking significant responsibility for Josh's care, education, and development. Middleton paid for Josh's preschool. Additionally, he paid mother $250 dollars per month while Josh was in Mother's custody.... [H]e was able to document approximately $12,000 he had given Mother over the years. Further, Middleton established a savings account for Josh's education.

... [The biological father], on the other hand, made no attempt to fulfill Josh's emotional need for a father. In fact, other than seeing Josh one time when he was three days old, [he] has never visited Josh. This parental void left by Josh's biological father coupled with the parental obligations assumed by Middleton compel us to find that Middleton undertook the responsibilities necessary to meet the [requirements] of the psychological-parent test.

... [Josh's therapist] explained that ... Josh, who was ten years old when his relationship with Middleton abruptly ended, was particularly devastated by the loss because he was at a stage in life when he was learning how to socialize.... [His] loss of contact with Middleton rendered Josh "at-risk regarding his ability to trust, [and to] form and maintain close relationships."

*Middleton, supra,* 369 S.C. at 599–603, 633 S.E.2d at 170–72 (footnote omitted).

Unlike in *Middleton, supra,* 369 S.C. at 598, 603, 633 S.E.2d at 169, 172, where there was a "parental void" in Josh's life, and the record was "replete with evidence illustrating how Mother's refusal to allow Middleton to visit with Josh has caused Josh significant harm," C.T.G. was living with both of her parents, she told her own therapist and Dr. Hockman she did *not* want to visit with stepfather, and there was no competent evidence showing that the termination of his visitation would have a negative impact on her or that it was in her best interests to continue with such visitation. Also, unlike in *Middleton,* where the mother's former boy-

friend continually contributed financially to Josh's support, stepfather here has not contributed to the child's support since the paternity order. To the contrary, after he learned he was not the biological father, he demanded that father repay him for supporting the child during her first three years.

Thus, even if we view the evidence in this case in the light most favorable to stepfather and assume he was a psychological parent to C.T.G. while they lived together in Minnesota, we conclude as a matter of law that stepfather failed to present evidence to rebut the presumption that the parents were acting in their child's best interests by terminating his visitation, and that he failed to show or proffer evidence of special circumstances that would justify the court's order allowing visitation against the wishes of the parents. *See Troxel, supra,* 530 U.S. at 58, 120 S.Ct. at 2056; *C.A., supra,* 137 P.3d at 327–28. We would reach the same conclusion whether we apply the preponderance of the evidence standard or the clear and convincing standard.

We therefore conclude the visitation order infringed upon the parents' fundamental right to direct the upbringing of their child.

### IV. Attorney Fees

We also vacate the trial court's award of attorney fees to stepfather. *See In re K.M.B., supra,* 80 P.3d at 917 (a court may award attorney fees in a domestic proceeding including a parental responsibility action brought by a nonparent under either §§ 13–17–102 or 14–10–119, C.R.S.2006).

The trial court did not specify the statutory basis on which it relied in making the award. While some language in the court's December 2005 order suggests it considered the parents' motion to terminate frivolous and groundless, the conclusions we have reached in this case preclude an award of attorney fees to stepfather on that basis. We also deny stepfather's request for attorney fees on appeal.

### IV. Conclusion

In summary, we conclude stepfather lacked standing to seek parenting time with C.T.G. because he failed to satisfy the requirements of § 14–10–123(1), the only statute that permits third parties such a right; and we further conclude, for the reasons set forth above, he would not be entitled to parenting time even if he had standing. Accordingly, the trial court erred in not granting the parents' motion to terminate such visitation.

The orders are reversed, and the case is remanded with directions to grant the parents' motion to terminate visitation.

Judge MÁRQUEZ and Judge BERNARD concur.