25CA0875 Peo in Interest of AB 10-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0875
Weld County District Court No. 23JV129
Honorable Allison J. Esser, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of A.B., a Child,

and Concerning T.B.,

Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Welling and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 30, 2025

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Debra W. Dodd, Counsel for Youth, Berthoud, Colorado, for A.B.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In this dependency and neglect proceeding, T.B. (father) appeals the juvenile court's judgment allocating parental responsibilities for A.B. (the youth) to her maternal grandparents. We affirm.

## I.     Background

¶ 2     In September 2023, the then-thirteen-year-old youth and her older half-sister (sister) were living with their mother.  Mother's mental health began deteriorating, so the youth and her sister snuck out of mother's home and went to their maternal grandparents' home.

¶ 3     Shortly thereafter, the Weld County Department of Human Services filed a petition in dependency and neglect alleging concerns about mother's mental health and substance use.  The petition noted that father and the youth had a positive relationship, but they had limited contact because father lived in Missouri.  The juvenile court granted temporary legal custody to the Department, and the youth and her sister remained with their maternal grandparents.

¶ 4     Approximately four months after the Department filed the petition, father entered a no-fault admission, and the juvenile court

adjudicated the youth dependent or neglected. On the same day, the court adopted a treatment plan for father.

¶ 5 Mother passed away in April 2024. Three months later, father moved the juvenile court to return the youth home to him. The court denied father's motion, finding that it was in the youth's best interests to remain with maternal grandparents.

¶ 6 Father then moved for an allocation of parental responsibilities (APR) for the youth to him. Thereafter, the youth filed a competing motion requesting an APR to maternal grandparents. The court held a contested hearing on the motions. After considering the evidence and taking the matter under advisement, the court granted an APR for the youth to maternal grandparents. The court ordered joint decision-making responsibility between maternal grandparents and father. The court also granted father telephone and video contact with the youth. It then ordered a step-up visitation plan in which father would exercise two weekend visits in Colorado and one week-long visit in Missouri during the first year of the plan, followed by two week-long visits in Missouri during the following years until the youth turned eighteen.

## II. Determination of the APR

¶ 7    Father contends that the juvenile court abused its discretion and "infringed upon [his] fundamental, constitutional right to parent" by granting an APR to maternal grandparents. Specifically, he argues that the court abused its discretion by granting the APR because (1) he was a fit parent; (2) no evidence showed that the youth's health, safety, or development would be at risk if she lived with him; and (3) considerable evidence showed that the youth's health, safety, and development would be in danger if she lived with maternal grandparents. We aren't persuaded.

### A. Applicable Law and Standard of Review

¶ 8    The Children's Code authorizes a juvenile court to enter an order allocating parental responsibilities and addressing parenting time when it maintains jurisdiction in a case involving a youth who is dependent and neglected. § 19-1-104(5)-(6), C.R.S. 2025; *People in Interest of E.Q.*, 2020 COA 118, ¶ 10. When allocating parental responsibilities in a dependency and neglect proceeding, the court must consider the legislative purposes of the Children's Code under section 19-1-102, C.R.S. 2025. *People in Interest of J.G.*, 2021 COA 47, ¶ 18. The overriding purpose of the Children's Code is to

protect a youth's welfare and safety by providing procedures through which the youth's best interests can be served. *Id.* at ¶ 19. Consequently, the court must allocate parental responsibilities in accordance with the youth's best interests. *Id.*

¶ 9 Even so, parents maintain a fundamental liberty interest in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Troxel*, the Supreme Court recognized that a parent who is adequately caring for their child or youth — a fit parent — is presumed to act in their child's best interests. *Id.* at 68-69. Thus, in a dependency and neglect proceeding, if the court determines that a parent has become fit, then it must apply the *Troxel* presumption before awarding an APR to a nonparent. *See J.G.*, ¶¶ 21, 27; *People in Interest of N.G.G.*, 2020 COA 6, ¶¶ 18-19. Applying the *Troxel* presumption requires the court to accord "at least some special weight to the parent's own determination" regarding the youth's best interests. *J.G.*, ¶ 21 (quoting *Troxel*, 530 U.S. at 70).

¶ 10 Nonetheless, the *Troxel* presumption may be rebutted if the nonparent shows by clear and convincing evidence that the parent's determination isn't in the youth's best interests and that the

nonparent's request is in the youth's best interests. *See N.G.G.,* ¶ 16; *In re Parental Responsibilities Concerning B.J.,* 242 P.3d 1128, 1132 (Colo. 2010). The court must also identify special factors that support entering an order contrary to the parent's wishes. *J.G.,* ¶ 22; *see also In Interest of C.T.G.,* 179 P.3d 213, 226 (Colo. App. 2007) (overturning a visitation order based on *Troxel* when the nonparent failed to present evidence of special circumstances to justify an order contrary to the parents' wishes).

¶ 11    Allocating parental responsibilities is a matter within the juvenile court's sound discretion. *In re Parental Responsibilities Concerning B.R.D.,* 2012 COA 63, ¶ 15. A court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of M.H-K.,* 2018 COA 178, ¶ 60. Further, we won't disturb a court's factual findings unless they are unsupported by the record. *See J.G.,* ¶ 17. Whether a court applied the correct legal standard in making its findings, however, is a question of law that we review de novo. *Id.*

B.    The Record Supported the APR Determination

¶ 12    In its oral ruling, the juvenile court first found that father was a fit parent because he had successfully completed his treatment

plan and no safety concerns existed with his home. Based on that finding, the court noted that it was required to "start with a presumption that what [father] want[ed] for [the youth was] in her best interest[s]" and that the youth should be with father. But the court concluded that father's presumption had been rebutted by clear and convincing evidence showing that the youth living with father wasn't in her best interests.

¶ 13    To support its conclusion, the juvenile court made extensive and thorough factual findings. It found that the youth's "lack of a relationship with father for years" and the youth's "extremely close bond" with her grandparents and sister were compelling reasons to conclude that moving to Missouri with father wouldn't be in the youth's best interests. The court also considered several "special factors" in determining that an APR to father wasn't in the youth's best interests while an APR to maternal grandparents was. Specifically, the court said that the following findings constituted the "special factors" it relied on in making its determination:

- The youth was sufficiently mature to express her opinion, and she was "very clear" that she wanted to remain in the home with her grandparents. The youth's wishes were

6

based on the fact that maternal grandparents' home was the home she had "known for her whole life" and that she had an "extremely close relationship" with her grandparents and sister.

- The youth's connection to her sister was strong, and her sister was "one of the most stable individuals in [the youth's] life."

- Maternal grandparents had been involved in the youth's care since at least 2018. But father left when the youth was very young and didn't have contact with her for a significant period of time, which diminished the bond between them.

- At the time of the hearing, the youth hadn't seen father in person for almost a year; she said that she would run away if forced to move to Missouri to live with him.

- The youth was well-adjusted to her Colorado school and had recently improved her grades and attendance. A move to Missouri would require the youth to "completely start[] over" at a new school.

- The youth was also well-situated in her Colorado community. She had future plans in Colorado, including a summer job and the desire to attend college in Denver.

- If the youth moved to Missouri to live with father, it would be a "drastic" change for her because she would be "going from her home state that she ha[d] been living in her entire life to an entirely new location where she ha[d] never lived before." The move would also prevent the youth from frequent contact with her grandparents and sister, who she relied on for support.

- The youth was particularly vulnerable because of the recent loss of her mother. It "would be devastating to her emotional and mental health" if the court "ripped her away" from her community, sister, and maternal grandparents only a year after her mother passed away.

¶ 14    The record supports these findings. The youth was fourteen years old by the time of the APR hearing and testified that she wanted to continue living with maternal grandparents and her sister. More specifically, the youth testified that she had a very good relationship with her grandparents and that she would be

8

"devastated" if she was separated from them. She also testified that she was very close with her sister, had lived with her sister for her whole life, and would "feel lost and probably alone" without her sister.

¶ 15 Similarly, the caseworker testified that the youth was very bonded to maternal grandparents and that they had maintained a "parental role" throughout the case. The caseworker stated that maternal grandparents were very supportive of the youth and that the youth relied on them when she was struggling. The caseworker described the youth's sister as her "protector" and testified that the youth relied on her sister for support in difficult times.

¶ 16 The youth, the caseworker, and maternal grandfather all testified that the youth and her sister had lived with maternal grandparents off and on since 2018. Father testified that he moved to Missouri when the youth was approximately three years old. The youth testified that she didn't have any contact with father for approximately nine years after he moved to Missouri. Father disagreed but acknowledged that he didn't have any in-person contact with the youth from the time the youth was four years old until she was ten years old.

¶ 17    Further, the youth testified that when she was three years old, she had one visit with her father in Missouri, but she didn't remember that visit. After that visit, she didn't visit father again until she was twelve years old. After this case opened, she visited father in Missouri two more times. The caseworker noted that after the second visit, the youth's relationship with father was "fractured" and became unstable because the youth felt betrayed when father asked the juvenile court to grant him an APR. Indeed, the youth testified that she had blocked father on her phone and wasn't open to communication with him because she felt like he didn't consider how she felt before he asked the court for an APR.

¶ 18    Moreover, the youth testified that she had attended school in the same district since second grade. She said that she had known many of her friends since then, had established good relationships with her teachers, and felt as though she belonged to a community through her Colorado school and neighborhood. The youth also testified that she had summer plans to work at the Colorado International Speedway and wanted to attend college in Denver when she graduated from high school. The youth believed that her

plans would "go down the drain" if she was forced to move to Missouri.

¶ 19    The caseworker agreed that the youth was connected to her school, noting that some of her school counselors had provided support when the youth's mother died. The caseworker further testified that the youth felt comfortable and "very secure" in her Colorado community because she had lived there for her entire life and had many friends in the area.

¶ 20    Finally, the caseworker, who testified as an expert in child protection casework, opined that it wouldn't be in the youth's best interests to move to Missouri to live with father. The caseworker based her opinion, in part, on the fact that moving to Missouri would separate the youth from the people who provide her support. The caseworker went on to opine that forcing the youth to communicate with father before she was ready would be "emotionally traumatizing" for the youth. The caseworker noted that the youth had threatened to run away if she had to move to Missouri. And the caseworker didn't believe that father would be able to meet the youth's emotional needs, particularly because she lacked a relationship with father and wouldn't feel comfortable

asking him for support. The caseworker concluded that a move to Missouri would be "detrimental" to the youth because she was still dealing with the loss of her mother and wouldn't have anyone to talk to if she was forced to leave maternal grandparents, her sister, and her community.

¶ 21 Based on the foregoing, we conclude that the juvenile court applied the correct legal standard for allocating parental responsibilities to a nonparent in a dependency and neglect case and that the record supports its determination that an APR to father wasn't in the youth's best interests, while an APR to maternal grandparents was.

### C. The Juvenile Court Wasn't Required to Grant an APR to Father Simply Because He Was Fit

¶ 22 To the extent that father argues that the APR to maternal grandparents was improper because he was a fit parent, we disagree. True, the juvenile court specifically found that father had become fit by the time of the APR hearing. But the fact that a parent is fit isn't, on its own, dispositive of whether a court must grant an APR to that parent. Rather, "parental deficiencies less serious than unfitness may give rise to a compelling reason not to

12

return the child home when considered in light of the [youth's] physical, mental, and emotional conditions and needs." *People in Interest of C.M.*, 116 P.3d 1278, 1283 (Colo. App. 2005).

¶ 23    Here, the juvenile court presumed that father's request for an APR was in the youth's best interests but nonetheless found that the presumption had been rebutted and that several "special factors" justified entering an order contrary to father's wishes. *See J.G.,* ¶¶ 21, 27; *C.T.G.,* 179 P.3d at 226. In other words, the court properly analyzed whether father's request for an APR was in the youth's best interests and determined it wasn't.

¶ 24    Accordingly, we reject father's argument that the juvenile court should have granted him an APR simply because he was a fit parent.

D.    The UMDA's Endangerment Standard Doesn't Apply

¶ 25    Next, citing section 14-10-129(1)(b)(I), C.R.S. 2025, father asserts that "in the domestic relations context, a court may not restrict a parent's time with his or her children unless parenting time would endanger the child's physical health or significantly impair the child's emotional development." From that premise, father argues that because no party presented evidence showing

that parenting time with him would endanger the youth, the APR to maternal grandparents constituted an improper restriction of his parenting time and a violation of his constitutional right to parent.

¶ 26    But section 14-10-129(1)(b)(I) is part of the Uniform Dissolution of Marriage Act (UMDA).  When a custody issue arises in a dependency and neglect proceeding, the court is guided by the Colorado Children's Code, not the UMDA.  *See J.G.*, ¶ 18; *People in Interest of L.B.*, 254 P.3d 1203, 1208 (Colo. App. 2011).  Consequently, unlike a restriction of parenting time in the domestic relations context, a court need not find endangerment before allocating parental responsibilities in a dependency and neglect case.  *See L.B.*, 254 P.3d at 1208.

¶ 27    Accordingly, the fact that the youth wouldn't be endangered if she lived with father wasn't dispositive of the juvenile court's APR determination.

### E.    Father's Concerns with Maternal Grandparents Didn't Render the APR Determination an Abuse of Discretion

¶ 28    Last, father argues that the juvenile court's judgment granting an APR to maternal grandparents rose to an abuse of discretion because "considerable evidence" showed that the youth's health,

14

safety, and development were at risk if she remained in maternal grandparents' care. True, father testified that he had numerous concerns about maternal grandparents' parenting abilities and their home. Specifically, father expressed concern that the youth's grades and school attendance were poor; that maternal grandparents allowed the youth to attend parties with alcohol, drugs, and inappropriate sexual activities; that the youth was entangled in contentious and emotionally difficult family conflicts; and that maternal grandparents had been unable to prevent the youth from being exposed to the details of mother's death.

¶ 29 But the juvenile court heard and considered the evidence father presented. In fact, it acknowledged father's concerns in its oral ruling. Even so, the court found, with record support and by clear and convincing evidence, that an APR to maternal grandparents was in the youth's best interests. As an appellate court, we don't reweigh the evidence presented to the juvenile court. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

## III. Disposition

¶ 30 We affirm the judgment.

JUDGE WELLING and JUDGE BERGER concur.